Louis JACKSON, Isadore Gartrell, Carl Wolfe & Roddy McDowell, Plaintiffs,

v.

DISTRICT OF COLUMBIA, Odie Washington, & The Federal Bureau of Prisons, Defendants.

No. Civ.A. 99–03276 (HHK).

United States District Court, District of Columbia.

March 21, 2000.

Jonathan L. Abram, E. Desmond Hogan, Christopher K. Murphy, Hogan & Hartson, LLP, Washington, DC, for plaintiff.

Jacques P. Lerner, Assistant Corporation Counsel, Office of the Corporation Counsel, Washington, DC, Michael A. Humphreys, Assistant United States Attorney, Office of the United States Attor-

ney for the District of Columbia, Washington, DC, Gregory Jackson, General Counsel, District of Columbia Department of Corrections, Washington, DC, for defendant.

## MEMORANDUM OF DECISION

KENNEDY, District Judge.

Plaintiffs represent a class of prisoners whose avowed religious faiths have doctrines which plaintiffs believe forbid them (or anyone else) from cutting their hair or shaving their beards, or both. They were convicted in the Superior Court of the District of Columbia or the United States District Court for the District of Columbia, were committed to the custody of the District of Columbia Department of Corrections ("D.C.Corrections") or the Federal Bureau of Prisons ("BOP"), and are presently serving their sentences in facilities operated by the Virginia Department of Corrections ("Virginia Corrections") in the Commonwealth of Virginia. In this action, plaintiffs seek declaratory and injunctive relief to prevent defendants, the District of Columbia, Odie Washington, the Director of D.C. Corrections (collectively "D.C. Defendants"), and BOP, from subjecting them to a grooming policy recently instituted by Virginia Corrections. Plaintiffs assert that the policy, which requires inmates to be clean-shaven and to keep their head hair short, violates their rights under the Religious Freedom Restoration Act ("RFRA")[1] and the Free Exercise Clause of the First Amendment.[2]

Following a hearing, the court, on December 14, 1999, granted plaintiffs' application for a temporary restraining order. Subsequently, following a three-day trial, the court, on March 13, 2000, entered judgment for defendants and dismissed plaintiffs' complaint. This memorandum sets forth the findings of fact and conclusions of law which constitute the grounds of this court's decision pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. FACTUAL BACKGROUND

On August 26, 1998, D.C. Corrections entered into a contract with Virginia Corrections to have the latter house D.C. prisoners for whom D.C. Corrections lacked bed space ("D.C.Contract").[3] The named class plaintiffs all received their sentences in D.C. Superior Court and are presently serving sentences in Virginia Corrections' Sussex II prison. This facility only houses D.C. prisoners and, as of February 22, 2000, held 1258 prisoners; an additional 87 were held in Virginia Corrections' Red Onion facility.[4]

On October 1, 1999, BOP entered a similar contract with Virginia Corrections ("BOP Contract").[5] As of February 22, 2000, about 913 BOP prisoners were held in Virginia Corrections' Greensville facility.

On November 15, 1999, Virginia Corrections posted a notice informing inmates in its facilities of Division of Operations Procedure 864 ("grooming policy").[6] The notice informed inmates that they were required to comply with the grooming policy by December 15, 1999. The grooming policy requires male inmates to cut their hair so it is no longer than one inch in length or depth and prohibits beards and dreadlocks. Inmates who do not comply with the policy upon their initial arrival at a Virginia Corrections facility may be restrained and brought into compliance. Noncompliance by inmates already housed in a Virginia Corrections facility subjects them to a number of possible sanctions, including solitary confinement, reduced commissary access, and suspension of visi-

---

**1.** *See* 42 U.S.C.A. §§ 2000bb *et seq.*

**2.** U.S. Const. amend. I.

**3.** *See* Pls.Ex. 4 ("D.C.Contract").

**4.** *See* Pls.Ex. 33.

**5.** *See* Pls.Ex. 5 ("BOP Contract").

**6.** Pls.Ex. 2.

tation privileges and attendance at work programs.

The grooming policy states it was promulgated "to promote safety, security and sanitation and to facilitate the identification of inmates." [7] The policy includes an exemption for prisoners with medical objections, however. Upon receipt of a medical order, the afflicted inmate may grow facial hair up to half an inch in length. These medical orders expire after 90 days without a physician's extension. The policy also contains an unwritten exemption for inmates seeking their cosmetology certification. These inmates are allowed to dye other inmates' hair within the "same color range." [8]

Virginia Corrections has not enforced its grooming policy against inmates from the State of Michigan. Edward Morris, Virginia Correction's Deputy Director, explained that the grooming policy has not been enforced against Michigan inmates because the prisoners are in the process of returning to Michigan from Virginia Corrections facilities. No other jurisdiction that has raised the issue with Virginia Corrections has procured an exception from the grooming policy for its inmates, including the District of Columbia.

## II. ANALYSIS

Plaintiffs' claims are easily stated and readily understood. Plaintiffs state that the tenets of their religions forbid the cutting of their beards or head hair or both. Given their beliefs, plaintiffs, on their own behalf and as representatives of similarly situated inmates, claim that Virginia Corrections' grooming policy violates their rights under the RFRA and the First Amendment. D.C. Corrections and BOP stoutly defend their conduct and interpose procedural objections and substantive defenses to this suit. Plaintiffs' claims and

7. Pls.Ex. 1 ¶ 864–4.0.

8. Tr. at 438–39.

defendants' objections and defenses are addressed below.

## A. STANDING

■ D.C. Defendants argue that plaintiffs have failed to establish their standing to bring this suit. To establish constitutional standing, plaintiffs must show that (1) they suffered an injury-in-fact, (2) defendants' conduct caused the injury, and (3) the relief sought would redress the injury alleged. [9] D.C. Defendants assert that plaintiffs cannot show the "causation" or "redressibility" elements of constitutional standing. D.C. Defendants argue that such a showing cannot be made because a fundamental premise of this suit—that Virginia Corrections is an agent of D.C. Corrections—is untrue. D.C. Defendants press the point that Virginia Corrections, not any person or entity connected to the District of Columbia, instituted the grooming policy about which plaintiffs complain. Consequently, D.C. Defendants argue, it cannot be said that they caused plaintiffs' alleged injury or that enjoining them would redress plaintiffs' alleged injury. While these arguments have facial appeal, close scrutiny reveals their lack of merit.

■ Plaintiffs offer two distinct theories to support their standing to bring this case. First, they argue that Virginia Corrections, at least insofar as the obligation to protect plaintiffs' rights is concerned, is defendants' agent. Consequently, plaintiffs maintain, defendants are responsible for Virginia Corrections' actions. Second, plaintiffs claim defendants have an independent responsibility not to sit idly by as their inmates in Virginia Corrections' physical custody have their rights violated. The court terms this second theory "continuing responsibility." As appropriate in this memorandum, the court differentiates between the two theories and analyzes each separately.

9. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04, 118 S.Ct. 1003, 1016–17, 140 L.Ed.2d 210 (1998).

Plaintiffs must prove causation by "demonstrat[ing] a causal link" between their injuries and defendants' conduct, such that "the injurious conduct is fairly traceable to [defendants'] actions, as opposed to the independent action of a third party not before the court." [10] Plaintiffs must demonstrate redressibility by "establish[ing] that it is likely, as opposed to merely speculative, that a favorable decision by this court will redress the injury suffered." [11]

As explained *infra*, the court finds that Virginia Corrections is the agent of both D.C. Corrections and BOP, at least for certain purposes. Plaintiffs, therefore, have standing to sue. Moreover, plaintiffs have standing because defendants have a "continuing responsibility" for certain purposes for the inmates they placed in Virginia Corrections facilities.

This circuit has rejected the notion that causation only lies when an agency is "the direct actor in the injurious conduct." [12] Rather, causation is demonstrated on a showing of "agency action which implicitly permits a third party to behave in an injurious manner." [13] Defendants fall squarely within this "implicit permission" standard. Indeed, plaintiffs would not be subject to Virginia Corrections' grooming policy but for defendants' decision to send them to Virginia. As the court has recently held, defendants "cannot absolve themselves of their duties to District prisoners simply by contracting for the services of a third party." [14] This is particularly true where, as here, defendants have the unconditional contractual right to remove plaintiffs from Virginia Corrections' custody.[15]

Similarly, plaintiffs have demonstrated redressibility under the "continuing responsibility" theory of their case. Virginia Corrections, as described more fully *infra*, has agreed to perform "extra obligations and duties" imposed by "any existing or future court orders ... which apply specifically to District of Columbia inmates." [16] Though there was some testimony at trial disputing this point, it is clear that the contracts require Virginia Corrections to follow any order that changes defendants' obligations to plaintiffs. Of course, whether Virginia chooses to honor the contracts is irrelevant to this determination.

## B. VENUE

■ Defendants strenuously argue that it is inappropriate for this court to hear this case and moved to transfer this suit to the Eastern District of Virginia, pursuant to 28 U.S.C. § 1404(a). Defendants argue that the Eastern District of Virginia is the appropriate forum given the centrality of Virginia Corrections' grooming policy to this suit and the location of many witnesses and documentary evidence in Virginia. These arguments are without merit.

Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." It is well-settled that this statute "is intended to place discretion in the district court to adjudicate a motion for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " [17] However, "[i]t is almost a

**10.** *America's Community Bankers v. FDIC*, 200 F.3d 822, 827 (D.C.Cir.2000) (citation omitted).

**11.** *Id.*

**12.** *Id.*

**13.** *Id.*

**14.** *Scott v. District of Columbia*, Civ. No. 98–1645, at 10–11 (D.D.C. Nov. 22, 1999).

**15.** *See* BOP Contract § 5.7; D.C. Contract § 5.7.

**16.** BOP Contract § 21.1; D.C. Contract § 20.1.

**17.** *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964)).

truism that a plaintiff's choice of a forum will rarely be disturbed ... unless the balance of convenience is strongly in favor of the defendant." [18]

The convenience of the parties and witnesses in this case did not favor transfer. The named plaintiffs had to travel from Sussex II prison regardless of whether their case was heard in the Eastern District of Virginia or before this court. Defendants could hardly claim the Eastern District of Virginia was more convenient for them, as they are located in the District of Columbia. With respect to the convenience of witnesses, each party's pretrial witness list contains a number of witnesses who reside in both the District and Virginia. Additionally, any argument that Virginia Corrections officials would have been inconvenienced by travel in this case was undermined by the "happiness" of the director of Virginia Corrections "to provide any witnesses or other information that [BOP and D.C. Defendants] deem[ed] necessary to defend [their] lawsuit." [19]

The interests of justice also did not weigh in favor of transfer. Virginia certainly has an interest in providing the forum for a case that addresses its government's policies. The District of Columbia, however, has a similar interest: the treatment of prisoners sentenced within its borders, many of whom undoubtedly are its citizens. [20]

Finally, a significant factor in the court's decision was the strict time limit imposed on this court's consideration of this case by 18 U.S.C. § 3626. Section 3626, in relevant part, states:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.... *Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required ... for the entry of prospective relief and makes the order final before the expiration of the 90–day period.* [21]

Because of the 90–day limit imposed by 18 U.S.C. § 3626, the court would have unreasonably burdened its counterpart in the Eastern District of Virginia had it transferred this case.

By operation of 18 U.S.C. § 3626(a)(2), the court's preliminary injunctive relief expired after March 13, 2000. [22] BOP filed its motion for transfer on February 2, 2000, more than a month after it intervened in the case. Plaintiffs' opposition and defendants' replies were filed by February 17. Had the court transferred the case on

18. *Gross v. Owen,* 221 F.2d 94, 95 (D.C.Cir. 1955).

19. Letter from Angelone to Washington of 12/22/1999, Ex. 1 to Pls.' Opp. to Fed. Def.Mot. to Transfer.

20. BOP accuses plaintiffs of "forum shopping" by filing their suit in this jurisdiction to avoid unfavorable Fourth Circuit precedent. *See Hines v. South Carolina,* 148 F.3d 353, 356 (4th Cir.1998) (holding that South Carolina Department of Corrections' grooming policy does not violate inmates' rights under the Free Exercise Clause). This argument can be reversed readily: perhaps BOP seeks transfer to avail itself of the very precedent it

claims plaintiffs avoid, particularly because the transferee court is not bound by the circuit law governing the transferor in federal-question cases. *See In re Korean Air Lines,* 829 F.2d 1171, 1174–76 (D.C.Cir.1987); *Bradley v. United States,* 161 F.3d 777, 782 n. 4 (4th Cir.1998). The court declines to consider self-serving arguments regarding "forum shopping" in the court's consideration of the motion to transfer.

21. 18 U.S.C.A. § 3626(a)(2) (West Supp.1999) (emphasis added).

22. The parties agreed to the extension of the temporary restraining order until the court's final ruling.

February 17 and, by an administrative miracle, the case file was delivered that very day to the Eastern District of Virginia, the hapless new judge would have had 24 calendar days to resolve the important issues this case presents. Within that 24–day period, the judge would have had to meet with counsel, schedule the case for trial, review the case file, prepare for and preside over a trial, and rule on the merits. This court would not think well of a judge who transferred such a case here and endeavors to comply with the injunction to "[d]o unto others as you would have them do unto you." [23]

In sum, the convenience of the parties and witnesses, consideration of the interests of justice, and the exceptional time constraints imposed by 18 U.S.C. § 3626 rendered transfer a thoroughly inappropriate option.

## C. AGENCY

■ To reiterate, plaintiffs claim that Virginia Corrections is defendants' agent, at least insofar as the duty to protect their rights is concerned. Defendants argue that Virginia Corrections is not their agent because, among other reasons, the BOP Contract and D.C. Contract explicitly state otherwise and defendants lack control over Virginia Corrections' actions. Plaintiffs reply that the BOP Contract and D.C. Contract indicate by reference to the Interstate Corrections Compact ("Compact") that Virginia Corrections stands in an agency relationship with defendants.

The Compact, which the District of Columbia and Virginia have both ratified,[24] provides that "[t]he terms and provisions of this compact shall be part of any contract entered into by the authority of or pursuant to the compact, and nothing in the contract shall be inconsistent with the compact." [25] The BOP Contract and D.C. Contract both indicate that they were formed under the Compact. Specifically, the BOP Contract states "[t]his Contract is entered into pursuant to the authority of Title 18, U.S.Code, § 4002 and the Interstate Corrections Compact." [26] The D.C. Contract states "[t]his Contract is entered into pursuant to the authority of the Interstate Corrections Compact." [27] As a result, the Compact preempts any terms of the BOP Contract or D.C. Contract which contradict it.

The BOP Contract provides that "[t]his Contract shall not be construed as to make [Virginia Corrections] an agent of BOP." [28] The D.C. Contract similarly states that "[t]his Contract shall not be construed as to make [Virginia Corrections] an agent of [D.C. Corrections]." [29] In contrast, the Compact, in the primary article concerning procedures for prisoner transfer from one jurisdiction to the other, states:

> Whenever the appropriate officials in a state party to this compact and which has entered into a contract pursuant to Article III shall decide that confinement in or transfer of an inmate to an institution within the territory of another party state is necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment, the appropriate officials may direct that the confinement be within an institution within the territory of the other party state, *the receiving state to act in that regard solely as*

---

**23.** Matthew 7:12.

**24.** *See* D.C.Code Ann. §§ 24–1001 to –1002 (West, WESTLAW through 1997–98 Dist. Council Sess.) ("D.C.Compact"); Va.Code Ann. §§ 53.1–216 to –217 (West, WESTLAW through 1999 Reg.Sess.) ("VA Compact").

**25.** D.C. Compact art. III(b); VA Compact art. III(b).

**26.** BOP Contract § 21.2.

**27.** D.C. Contract § 20.2.

**28.** BOP Contract § 28.1.

**29.** D.C. Contract § 27.1.

*agent for the sending state.*[30]
The Compact language dictates that Virginia acts as an agent for defendants, the language in their contracts notwithstanding.

Defendants, of course, contest the Compact's preemption here. D.C. Defendants argue that the agency language in the Compact is limited to the inmates' transfer to and reception into Virginia Corrections facilities. They claim the phrase "the receiving state to act in that regard solely as agent for the sending state"[31] is best construed as a discrete agency provision to preclude inmates from challenging the legality of their transfer and does not cover the entire contractual relationship between D.C. Corrections and Virginia Corrections. This argument would be persuasive if it were based on the actual text of the Compact. It is not. If such a limitation was intended, surely the Compact would read differently. As it in fact reads, the phrase "in that regard" seems to refer to "confinement." Such a reading confirms and is consistent with the proposition that Virginia Corrections acts as an agent of defendants for the purposes of plaintiffs' confinement in Virginia Corrections facilities.

BOP argues that since it is not a party to the Compact, it cannot be bound by its dictates. This argument fails to acknowledge the BOP Contract's language, which indicates formation under the Compact. BOP argues that the reference to the Compact is merely to indicate Virginia's authority to contract with the federal government and that BOP itself entered the BOP Contract per 18 U.S.C. § 4002, which is also referenced in the BOP Contract. This is certainly true, and of no moment.

As described *supra*, the BOP Contract explicitly invokes the Compact and, therefore, is governed by the Compact's preemption provision. The agency language in the Compact applies to BOP.

■ Even if the Compact did not support the proposition that Virginia Corrections is an agent of defendants, plaintiffs could still proceed with their suit. As described *infra*, two theories underlie plaintiffs' claims: agency and "continuing responsibility." The BOP Contract and D.C. Contract both support plaintiffs' suit under their "continuing responsibility" theory. Both indicate that plaintiffs remain in the "legal custody" of defendants while in Virginia Corrections facilities.[32] Further, the Compact states that "confinement in [Virginia] shall not deprive any inmate so confined of any legal rights which the inmate would have had if confined in an appropriate institution [of defendants']."[33] Consequently, since defendants retain legal custody over plaintiffs and plaintiffs retain any rights they would have if held in defendants' facilities, plaintiffs' suit is well grounded against defendants' agency challenge.

### D. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants argue that this suit must be dismissed because plaintiffs failed to exhaust their administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA").[34] The PLRA, passed on April 26, 1996, requires a prisoner filing a prison-conditions suit under any federal law to exhaust available administrative remedies first. In response to

---

30. D.C. Compact art. IV(a) (emphasis added); *see* VA Compact art. IV(a) (emphasis added).

31. D.C. Compact art. IV(a).

32. BOP Contract § 28.1; D.C. Contract § 27.1.

33. D.C. Compact art. IV(e); VA Compact art. IV(e).

34. *See* Pub.L. No. 104–134, § 803, 110 Stat. 1321 (1996). The PLRA, codified in part at 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

defendants' exhaustion argument, plaintiffs claim they did exhaust their available administrative remedies and, even if they did not, the court should except them from the PLRA's exhaustion requirement because of the irreparable injury they would suffer if forced to exhaust the remedies provided by Virginia Corrections. They also argue that exhaustion should not be required because of the futility of doing so in this case.[35]

## 1. BURDEN OF PROOF

■ Resolution of the exhaustion issue requires the court to decide an issue of first impression in this jurisdiction: does the PLRA's exhaustion requirement create an affirmative defense (as argued by plaintiffs) or a condition precedent to filing suit which must be alleged by plaintiffs (as argued by defendants)? Much rests on this determination, as the burden of proof lies with defendants if the court finds the former and with plaintiffs if the latter.[36]

While this circuits' courts have not addressed this issue, other courts have done so with mixed results. The Seventh Circuit, in *Perez v. Wisconsin Department of Corrections,* concluded that "[d]efendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations."[37] In a later case, the Seventh Circuit explicitly stated the fairly transparent assumption in *Perez* and held "[a] prisoner's failure to exhaust administrative rem-

edies before filing a claim constitutes an affirmative defense."[38]

At odds with *Perez* is the Sixth Circuit's decision in *Brown v. Toombs.*[39] In *Toombs,* the Sixth Circuit reasoned that "the plain mandatory language of the statute . . ., the legislative purpose underlying the plain language, and the sound policy on which it is based" meant that "prisoners filing § 1983 claims must allege and show that they have exhausted all administrative remedies."[40] After *Toombs,* the Sixth Circuit requires prisoners to "attach to [their] § 1983 complaint the administrative decision, if it is available, showing the administrative disposition of the complaint" and directs district courts in the circuit to "enforce the exhaustion requirement *sua sponte* if not raised by the defendant."[41]

The court finds Judge Easterbrook's opinion in *Perez* the more compelling paradigm and holds that Section 1997e(a) is best construed as an affirmative defense. Judge Easterbrook's mention of the statute of limitations is helpful and worth explicating.[42] Of course, under Federal Rule of Civil Procedure 8(c), a statute-of-limitations defense not made in the defendant's first responsive pleading is forever lost (or at least until the defendant successfully moves to amend the answer). The language of statutes of limitations tend to be equally imperative as Section 1997e(a). For example, D.C.Code § 28:4–111, which deals with suits concerning bank deposits

---

**35.** Plaintiffs further claim that the PLRA's exhaustion requirement does not apply to the RFRA. To support this argument, they point to the RFRA provision which states "[f]ederal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter." 42 U.S.C.A. § 2000bb–3(b) (West 1994). They note that the PLRA was enacted after November 16, 1993, and did not explicitly mention applicability to the RFRA. Assuming the continued vitality of the RFRA as explained *infra,* this argument is unconvincing. This provision only applies to substantive law, not a law, such as the PLRA, that delineates the procedure and timing for filing certain types of suits.

**36.** *Compare* Fed.R.Civ.P. 8(c) (affirmative defenses) *with* Fed.R.Civ.P. 9(c) (conditions precedent).

**37.** 182 F.3d 532, 536 (7th Cir.1999).

**38.** *Massey v. Helman,* 196 F.3d 727, 734–35 (7th Cir.1999).

**39.** 139 F.3d 1102, 1104 (6th Cir.1998).

**40.** *Id.*

**41.** *Id.*

**42.** *See Perez,* 182 F.3d at 536.

and collections under the District's Uniform Commercial Code, states that "[a]n action to enforce an obligation, duty, or right arising under this article must be commenced within 3 years after the cause of action accrues." It is of no moment that this statute of limitations states its obligation positively ("An action ... must be commenced") while Section 1997e(a) states its negatively ("No action shall be brought ... until"); both delineate strict requirements for suit, so it seems to the court appropriate to treat them similarly for procedural purposes.

While the *Toombs* court's reasoning has some first-blush appeal, it is unconvincing for two reasons. First, Section 1997e's overall structure indicates Congress did not intend to vest courts with *sua sponte* dismissal power for failure to exhaust. Section 1997e in part reads as follows:

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

(b) Failure of State to adopt or adhere to administrative grievance procedure

The failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under section 1997a or 1997c of this title.

(c) Dismissal

(1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a pris-

oner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

(2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

Conspicuously absent from either Sections 1997e(a) or (c) is a directive for the court to consider *sua sponte* dismissal for failure to exhaust administrative remedies. If Congress intended this unique remedy, surely it would have included it in the enumerated grounds for *sua sponte* dismissal in Section 1997e(c)(1). Any argument that Congress intended the broad categories in Section 1997e(c)(1) to include dismissal for failure to exhaust is demolished by Section 1997e(c)(2), which grants the court power to dismiss *sua sponte* without requiring exhaustion of administrative remedies. It makes little sense to permit dismissal for failure to exhaust and then state the court may dismiss without "first requiring the exhaustion of administrative remedies." [43]

Second, the court is not persuaded by *Toombs* because *sua sponte* dismissal is generally reserved for dismissal for lack of subject-matter jurisdiction.[44] Of course, exceptional circumstances can arise where *sua sponte* dismissal is otherwise appropriate, but only upon fair notice to the plaintiff.[45] Given the similarity between Sec-

**43.** 42 U.S.C.A. § 1997e(c)(2) (West Supp. 1999).

**44.** *Cf. Doe v. District of Columbia*, 93 F.3d 861, 871 (D.C.Cir.1996) ("A claim that the court lacks jurisdiction under Article III of the Constitution may not be waived, since the jurisdiction at issue goes to the foundation of

the court's power to resolve a case, and the court is obliged to address it sua sponte.") (citation omitted).

**45.** *Cf. McBride v. Merrell Dow & Pharm., Inc.,* 800 F.2d 1208, 1212 (D.C.Cir.1986) ("While district courts possess the authority to enter summary judgment against a party sua

tion 1997e(a) and affirmative defenses such as statute of limitations, and the infirmities of the *Toombs* decision, the court holds that Section 1997e(a) is an affirmative defense.[46]

## 2. THE AVAILABLE ADMINISTRATIVE REMEDIES

The administrative remedies available to inmates in Virginia Corrections facilities are set forth in an official inmate grievance protocol. This protocol creates a four-stage exhaustion procedure.[47] An inmate with a grievance must initially file an informal complaint with prison staff. Prison staff has 15 calendar days to respond in writing to the grievance, after which the inmate may file a Level I formal grievance with the Institutional Ombudsman. The inmate must attach the informal-complaint response to the Level I grievance. The inmate has 30 calendar days from the date of the incident giving rise to the grievance to file the informal complaint and Level I grievance. The prison's Institutional Ombudsman coordinates staff investigation of the inmate's complaint and prepares a written response to the inmate's grievance, which the prison warden reviews before it is delivered to the inmate. The Level I response must be completed within 30 calendar days. Responses not completed within this time are deemed moot and appealable to the next level of review.

The inmate may appeal the Level I determination to Level II within five days of receipt. This appeal is reviewed and investigated by the appropriate Virginia Corrections' regional office and must be responded to within 20 calendar days. An inmate who wishes to challenge the substance or interpretation of a procedure may appeal the Level II determination to Level III. These grievances are handled by the appropriate Deputy Director or the Director of Virginia Corrections. If the inmate's grievance is determined not to qualify for Level III review, it shall be returned to the inmate stating this. In any event, the Level III determination must be completed within 20 calendar days and is the final stage in the grievance procedure.

Virginia Corrections also accommodates "emergency grievances," which are defined as "situations or conditions which may subject the inmate to immediate risk of serious personal injury or irreparable harm." [48] The inmate must fill out the appropriate form (which should be available at all hours) and submit it to a staff person. The inmate must receive a response within eight hours of filing. Emergency grievances are not appealable; upon denial, an inmate may file an informal complaint and pursue the administrative remedies described above.

sponte, ... that authority may only be exercised 'so long as the losing party was on notice that she had to come forward with all her evidence.'") (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

**46.** The parties dispute whether defendants waived the affirmative defense of exhaustion of administrative remedies by not timely raising it. The court finds neither waiver nor forfeiture here. BOP raised the defense in its answer to plaintiffs' first amended complaint though it it failed to raise the defense in its initial answer or pre-answer motion as usually required in this circuit, *see Smith–Haynie v. District of Columbia,* 155 F.3d 575, 577–78 (D.C.Cir.1998), plaintiffs' filing of their amended complaint gave BOP another

chance to assert the defense. *See Massey,* 196 F.3d at 735 (citations omitted). D.C. Defendants filed a "notice" they were joining BOP's affirmative defense of exhaustion. The court treats this as a motion to amend their answer to plaintiffs' first amended complaint and, in light of the liberal amendment policy in this circuit when no prejudice will arise, *see Material Supply Int'l, Inc. v. Sunmatch Industrial Co.,* 146 F.3d 983, 991 (D.C.Cir.1998), grants it. Plaintiffs suffered no prejudice here because the exhaustion arguments were identical for all defendants and plaintiffs knew of the defense nearly two weeks in advance, from designations on BOP's witness list.

**47.** *See* BOP Ex. 8 §§ 866–7.13–7.15.

**48.** *Id.* § 866–7.18.

### 3. WERE ADMINISTRATIVE REMEDIES EXHAUSTED?

■ In this circuit, exhaustion of administrative remedies by one class member satisfies the requirement for the class.[49] Therefore, as an affirmative defense, the burden lies with defendants to demonstrate that no class member has exhausted his administrative remedies.

■ BOP makes a straightforward attempt to prove plaintiffs failed to exhaust. BOP directs the court to the following testimony of Edward Morris, Virginia Corrections' Deputy Director of Administration: "[A]s of last Friday [February 25, four days before trial commenced], no grievances filed by members of the class had completed review at level three [of the Virginia Corrections' grievance procedure]."[50] BOP also offers the deposition testimony of Janice Turner, Institutional Ombudsman for Sussex II prison, which indicates that Virginia Corrections' grooming policy is grievable under the grievance procedure. The court finds this testimony—which plaintiffs have not challenged—to be credible and reliable.

Plaintiffs argue that defendants have not carried their burden for a number of reasons. Plaintiffs point out that defendants did not provide evidence concerning inmate emergency grievances filed at Greensville, the prison housing BOP prisoners. BOP's witness on this point testified that no inmate had filed an emergency grievance challenging the grooming policy at Sussex II, which houses only D.C. prisoners. This point misses the mark, because Virginia Corrections' policy states that "filing of an emergency grievance *does not* satisfy the exhaustion requirement."[51] Evidence concerning emergency filings are superfluous to the court's exhaustion determination.

Plaintiffs next argue that defendants did not prove their exhaustion defense because named plaintiff Jackson himself effectively exhausted his administrative remedies. Jackson filed an informal complaint and never received a response; from prior experience he knew he could not file a Level I grievance without the informal-complaint response attached. The court has no reason to doubt Jackson's statements on this point and indeed found his testimony credible. Again, however, plaintiffs miss the mark, because Jackson only filed his informal complaint sometime in December but before December 15, which is perilously close to the date plaintiffs filed this suit.

■ Section 1997e(a) states in relevant part that "[n]o action shall be brought ... until such administrative remedies as are available are exhausted." Plaintiffs implicitly claim that this language permits filing of an action so long as exhaustion of administrative remedies is completed before trial, judgment, or some other time unspecified in the statute. The court disagrees and finds the statute means what it plainly says: prisoners may only file actions under federal law concerning their conditions of confinement after they have exhausted their prison's administrative remedies. Other courts that have squarely addressed this issue have ruled identically.[52] As the court finds the language of the statute unambiguous, there is no call to explore the statute's legislative history.[53]

Hence Jackson needed to exhaust his administrative remedies before plaintiffs filed suit on December 10. Per Jackson's testimony and the Virginia Corrections'

---

**49.** *See Hartman v. Duffey,* 88 F.3d 1232, 1235 (D.C.Cir.1996) (citation omitted).

**50.** *See* Tr. at 371.

**51.** BOP Ex. 8 § 866–4.0 (emphasis added).

**52.** *See, e.g., Perez,* 182 F.3d at 534; *Garrett v. Hawk,* 127 F.3d 1263, 1265 (10th Cir.1997).

**53.** *See Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."), *cited in American Petr. Inst. v. EPA,* 198 F.3d 275, 280 (D.C.Cir.2000).

grievance policy, it does not appear Jackson could appeal his informal complaint to Level I without a written response. Construing Jackson's testimony in the light most favorable to plaintiffs, the court assumes he filed his informal complaint on December 1. Virginia Corrections' policy requires a response to be issued within 15 calendar days, by December 16. When plaintiffs filed this suit, Jackson's informal complaint was still pending, and he could not have known its result. This situation would be different if, for example, Jackson was to have received the response to his informal complaint by December 9 and he did not; given his testimony, the court would have entertained the possibility that he had indeed exhausted his administrative remedies. But Jackson did not file early enough, and, in light of Section 1997e(a), Virginia Corrections' failure to respond to Jackson's informal complaint is irrelevant.

Plaintiffs' third argument to demonstrate BOP failed to prove exhaustion similarly misses the mark. Plaintiffs argue that named plaintiff Wolfe testified credibly that the Sussex II warden orally told him that only a court would provide him relief from the grooming policy. The court shall not analyze whether this statement relieves Wolfe of his duty to exhaust his administrative remedies because he only filed his Level II appeal on February 15, 2000. Plaintiffs argue that Virginia Corrections' policy is exhausted upon completion at Level II (as explained *infra*, the court disagrees); even if true, Wolfe failed to complete Level II review before the date plaintiffs filed their complaint, so the warden's alleged statement to him has no bearing on the court's determination.

Plaintiffs' fourth and chief argument to demonstrate BOP's failure to prove exhaustion is that Virginia Corrections' grievance policy—as applied to grooming-policy complaints—is actually exhausted upon completion of Level II review, and defendants have provided no evidence concerning inmate grievances at Level II.

Plaintiffs direct the court again to testimony of Deputy Director Morris to support their point. Interestingly, BOP directs the court to this very testimony to support the opposite proposition, that inmate grievances about the grooming policy qualify for review through Level III. The relevant portions of Mr. Morris' testimony are as follows:

Q: It's true that [Virginia Corrections] will not give an exemption to those inmates who have religious objections to the grooming policy; is that correct?

A: That's correct.

Q: So any inmate grievance reaching level three that requests religious exemption to the grooming policy should be denied; is that correct?

. . . .

A: It would depend on the nature of the grievance. He can grieve the substance of the procedure or the interpretation of it. He would have a remedy available, for example, if somebody had incorrectly interpreted the procedure to him, he would get a correct interpretation. If he were appealing some aspect of the procedure that we agreed needed to be changed, we could agree to change the substance of the procedure.

Q: Let's talk about an inmate who is a[ ] Rastafarian who complains about the grooming policy's requirement to cut my hair, if he said that was his grievance. If that's how he stated his grievance, should his grievance be denied?

[Objection to speculation sustained.]

COURT: It can fairly be said that . . . the grooming policy is what it is and you intend to enforce it?

A: Yes, sir.[54]

Morris' testimony indicates that inmates who challenge the grooming policy must pursue their grievances through Level III to exhaust their administrative remedies. When asked specifically whether any inmate appealing to Level III "should be

---

**54.** Tr. at 372–74.

denied," Morris cogently explained that if the inmate wished to complain about either the application or substance of the grooming policy, he could file a Level III grievance. As BOP introduced testimony that as of February 25, 2000 (well after the December 10, 1999, filing of the complaint), no inmate in plaintiffs' class had completed the Virginia Corrections' grievance process through Level III, it has proven that plaintiffs failed to exhaust their administrative remedies.

## 4. EXCEPTIONS TO EXHAUSTION REQUIREMENT

■ While arguing that defendants have failed to prove plaintiffs did not exhaust their administrative remedies, plaintiffs contend that even if they did not exhaust, their failure to do so should not preclude them from bringing this suit. In their post-trial brief, they argue generally that the court should excuse them from their exhaustion obligations under Section 1997e(a) because exhaustion would subject them to irreparable harm. At prior times, plaintiffs have argued that the court should find their exhaustion obviated by its futility in this case. The court shall consider these distinct points together.

The court agrees with plaintiffs that they would suffer irreparable injury if subjected to the grooming policy pending a judicial determination. Further, in light of Deputy Director Morris' admission that the grooming policy "is what it is" and that Virginia Corrections would enforce it, the court finds that exhaustion would be futile, in the sense that plaintiffs would not have secured a religious exemption to the grooming policy even if they had strictly complied with Virginia Corrections' inmate-grievance protocol. Nevertheless, these two fact-based determinations by the court do not carry the day because, as defendants point out, Section 1997e(a) does not allow for futility or irreparable-injury exceptions to its exhaustion requirement. For the court to apply such exceptions in its discretion would violate established Supreme Court doctrine and flout Congress' intent.

The Supreme Court has twice considered Section 1997e(a) and has given important instruction on the judiciary's role in interpreting and applying exhaustion requirements. In *Patsy v. Board of Regents of Florida*, an employment discrimination suit in which plaintiff claimed race and gender discrimination in defendant's employment decisions, the Supreme Court held that § 1983 did not require all plaintiffs to exhaust administrative remedies before filing suit.[55] Basing its holding in part upon Congress' failure to include all § 1983 claimants in the prisoner-exhaustion requirements under Section 1997e(a), the court identified legislative intent as the lynchpin to all exhaustion determinations:

> [L]egislative purpose ... is of paramount importance in the exhaustion context because Congress is vested with the power to prescribe the basic procedural scheme under which claims may be heard in federal courts. Of course, courts play an important role in determining the limits of an exhaustion requirement and may impose such a requirement even where Congress has not expressly so provided. However, the initial question whether exhaustion is required should be answered by reference to congressional intent; and a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent.[56]

In an opinion concurring in part, Justice White more directly stated that "exhaustion is a statutory issue and the dispositive word on the matter belongs to Congress."[57] These statements demonstrate

---

**55.** 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

**56.** *Id.* at 501, 102 S.Ct. 2557 (footnote omitted).

**57.** *Id.* at 518, 102 S.Ct. 2557 (White, J., concurring).

that courts should consider Congress' intent concerning exhaustion and, if it is clear, stop the inquiry.

The second Supreme Court precedent makes this point more explicitly. In *McCarthy v. Madigan,* the court held that a prisoner filing a *Bivens* action against prison officials for deliberate indifference to his medical needs need not exhaust the BOP's regulatory grievance procedure because Congress had not spoken directly on the issue.[58] Before finding Section 1997e(a) not to apply directly and, in any event, to cut against requiring exhaustion, the Court held that "[w]hen Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." [59]

As counseled by the Supreme Court, the court considers the text of Section 1997e(a) and its legislative history. The court begins with the text of Section 1997e(a). Prior to passage of the PLRA, Section 1997e(a) permitted the court to continue proceedings such as this for up to 180 days pending "exhaustion of such plain, speedy, and effective administrative remedies as are available," so long as the Attorney General had certified or the court had determined the prison administrative remedies met certain minimum standards.[60] With passage of the PLRA, the statute was amended to its current form, which requires exhaustion of "such administrative remedies as are available." [61] The court finds much significance in this change; Congress elected to remove the phrase "plain, speedy, and effective" from the statute. Of course, the court assumes this change to the statute's wording was made for a reason.[62] Here, the reason is fairly clear: Congress did not want the federal courts to sit as a super-department of corrections and review the effectiveness of prison administrative remedies or the speed with which they lead to a final resolution.

A futility or irreparable-injury exception to Section 1997a(e) truly would swallow the rule. It may often be the case that prison officials will not grant relief from a policy they themselves have promulgated; hence in a great number of inmate prison-conditions cases futility could be claimed. Further, it seems just as likely that any inmate could claim irreparable injury from an act or omission by prison officials. Whether or not these are meritorious arguments is beside the point; they would have judges exercise clairvoyance and predict the future in a way we are not well situated to do. These exceptions would require the court to review prisoner complaints before prison officials themselves have had the opportunity to address—and perhaps correct—them and create a record to aid subsequent judicial review. Such a requirement would flout what the Supreme Court has declared as the exhaustion doctrine's dual purpose of "protecting administrative agency authority and promoting judicial efficiency." [63]

The legislative history of the PLRA supports the court's reading of Section 1997e(a). Rep. Lobiondo, during the floor debate, described the *McCarthy* decision, the Supreme Court's invitation for a clear legislative exhaustion mandate, and the PLRA's purpose:

> The real problem with [prison condition] cases came with the Court's deci-

---

**58.** 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

**59.** *Id.* at 144, 112 S.Ct. 1081 (citations omitted).

**60.** 42 U.S.C.A. § 1997e(a) (West 1994) (amended 1996).

**61.** 42 U.S.C.A. § 1997e(a) (West Supp.1999).

**62.** *See Nyhuis v. Reno,* 204 F.3d 65, 71 (7th Cir.2000) ("In interpreting the alteration in language, we must presume, as always, that this amendment was intended to have 'real and substantial effect.' ") (citing *Stone v. INS,* 514 U.S. 386, 397, 115 S.Ct. 1537, 1545, 131 L.Ed.2d 465 (1995)).

**63.** *McCarthy,* 503 U.S. at 145, 112 S.Ct. 1081.

sion in [*McCarthy v. Madigan*] that an inmate need not exhaust the administrative remedies available prior to proceeding with a *Bivens* action for money damages only .... [a decision which] was made without the benefit of any legislative guidance and the Court made that point very clearly in its opinion, almost to the point of asking that Congress do something....

In order to address the problem of *Bivens* actions, I introduced H.R.2468, the Prisoner Lawsuit Efficiency Act ("P.L.E.A."). This bill makes it clear that administrative exhaustion be imposed in all actions arising under the *Bivens* case. In H.R.667, the House adopted a similar provision to that of the P.L.E.A. by requiring the exhaustion of administrative remedies for those prisoners bringing suit under 42 U.S.C. § 1979[sic] (the Civil Rights for Institutionalized Persons Act ("CRIPA")).

The new administrative exhaustion language in H.R.2076 will *require that all cases* brought by Federal inmates *contesting any aspect of their incarceration* be submitted to administrative remedy process *before proceeding to court.* By returning these cases to the Federal Bureau of Prisons, we will provide the opportunity for early resolution of the problem, we will reduce the intrusion of the courts into the administration of the prisons, and we will provide some degree of fact-finding so that when or if the matter reaches Federal court there will be a record upon which to proceed in a more efficient manner.[64]

Indeed, for the court to find otherwise would not only trammel the plain meaning of Section 1997e(a) but also Congress' intent. The court's decision here comports with those of a number of other circuits.[65]

The court is mindful that this circuit has created discretionary judicial exceptions to the doctrine of exhaustion for futility and irreparable harm.[66] As explained *supra,* the court is convinced that Section 1997e(a) is particularly ill-suited for application of these judicial doctrines given its recent amendment by Congress and the Supreme Court's *Patsy* and *Murphy* decisions. As another circuit has held, "[e]xhaustion of administrative remedies may be either mandated by statute or imposed as a matter of judicial discretion. Congress now has mandated exhaustion in Section 1997e(a) and there is no longer discretion to waive the exhaustion requirement."[67] Section 1997e(a) does not permit accommodation for futility or irreparable harm.

Defendants' facile showing that no prisoner in Greensville, Red Onion, or Sussex II prisons had exhausted their administrative remedies by the end of the week before trial is sufficient to prove that plaintiffs failed to exhaust their administrative remedies and carry defendants' affirmative defense.

## E. RELIGIOUS FREEDOM RESTORATION ACT

Typically, a determination by this court that plaintiffs in a prison-conditions suit had not exhausted their administrative remedies would result in dismissal of the suit without prejudice and the court would not address the merits of the litigation.[68] However, this case is highly unusual. Summary relief was not sought on the

**64.** 141 Cong.Rec. H14078–02, H14105 (daily ed. Dec. 6, 1995) (emphasis added).

**65.** *See, e.g., Nyhuis,* 204 F.3d 65, 68–76; *Wyatt v. Leonard,* 193 F.3d 876, 878 (6th Cir.1999); *Perez,* 182 F.3d at 537; *Alexander v. Hawk,* 159 F.3d 1321, 1328 (11th Cir.1998).

**66.** *See Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 105–09 (D.C.Cir.1986).

**67.** *Alexander,* 159 F.3d at 1325.

**68.** *See, e.g., Perez,* 182 F.3d at 536 ("[Section 1997e(a)] can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit.")

grounds of exhaustion and, as described earlier, summary dismissal by the court would have been inappropriate. Further, the stringent time restraints on this case made such consideration next to impossible. Given these unique circumstances, the considerable resources devoted to the presentation of evidence, certain appellate review of this court's exhaustion ruling, and the nature of the issues under consideration in this class-action litigation, the court finds it proper to proceed to the merits.

At the outset, the court observes that D.C. Defendants—but not BOP—vigorously argue that the RFRA was struck down in its entirety by the Supreme Court in *City of Boerne v. Flores.*[69] Plaintiffs argue that *City of Boerne* only invalidated the RFRA as applied to the states under the 14th Amendment's enforcement provision, and that the statute survives in full force as applied to defendants under Article I, Section 8 of the Constitution. The court shall not rule on the RFRA's constitutionality.[70] As this and other circuits have done before,[71] the court assumes the RFRA's constitutionality.

The RFRA provides in part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.[72]

---

**69.** 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

**70.** Whether the RFRA survives *City of Boerne* is in doubt. In *City of Boerne*, the Court stated "[t]his case calls into question the authority of Congress to enact RFRA. *We conclude the statute exceeds Congress' power." City of Boerne*, 521 U.S. at 511, 117 S.Ct. at 2160 (emphasis added). *But see Florida Prepaid Postsec. Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 119 S.Ct. 2199, 2206, 144 L.Ed.2d 575 (stating that in *City of Boerne*, the court "held that [the RFRA] exceeded Congress' authority under § 5 of the Fourteenth Amendment, *insofar as RFRA was made applicable to the states.*") (emphasis added); *but cf. Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' ") (citation omitted). The Eighth Circuit, the only circuit to substantially consider the matter after *City of Boerne*, held the RFRA survived as applied to

the Bankruptcy Act. *See In re Young*, 141 F.3d 854, 856 (8th Cir.1998). Of course, this circuit upheld the RFRA's constitutionality in *E.E.O.C. v. Catholic Univ. of Amer.*, 83 F.3d 455, 469–70 (D.C.Cir.1996), but the constitutional landscape has changed significantly since this *pre-Boerne* decision was issued.

**71.** *See Alamo v. Clay*, 137 F.3d 1366, 1368 (D.C.Cir.1998) ("[W]e assume, without deciding, that the RFRA applies to the federal government, notwithstanding the Supreme Court's decision in *City of Boerne.*"); *Sutton v. Providence St. Joseph Medical Ctr.*, 192 F.3d 826, 833–34 (9th Cir.1999) ("We assume, without deciding, that RFRA is constitutional as applied to federal law."); *Adams v. Comm'r*, 170 F.3d 173, 175 (3rd Cir.1999) ("For the purposes of this appeal, we assume without deciding that RFRA is constitutional as applied to the federal government."). *But see Branch Ministries, Inc. v. Richardson*, 970 F.Supp. 11 (D.D.C.1997) (holding, without analysis, that *Boerne* invalidated RFRA).

**72.** 42 U.S.C.A. § 2000bb–1 (West 1994).

The RFRA employs an explicit burden-shifting mechanism. In cases that involve a rule of neutral applicability, plaintiffs are required to prove a substantial burden on their religion. If they are successful, the burdens of production and persuasion shift to defendants to show that the challenged rule furthers a compelling governmental interest and is the least restrictive means of furthering that interest.[73]

### 1. SUBSTANTIAL BURDEN ON RELIGIOUS BELIEFS

The court begins its RFRA inquiry by determining whether plaintiffs have proven a substantial burden to their religious beliefs. Named plaintiffs Jackson and Wolfe provided the chief testimony toward this point. Jackson testified he is a Sunni Muslim, and a fundamental tenet of his religion forbids him and other Sunni Muslims from shaving their facial hair. Wolfe testified that he is a Rastafarian and that adherents such as he, who have taken the Vow of the Nazarite (based on *Numbers* 6 of the Bible), are prohibited from shaving their beards or cutting their hair.

BOP concedes the sincerity of plaintiffs' religious beliefs. D.C. Defendants do not. At trial, D.C. Defendants vigorously cross-examined Jackson and Wolfe in an attempt to discredit: (1) their knowledge of their religions, (2) the centrality of their avowed beliefs to their faiths, and (3) their position that the grooming policy will impose a substantial burden on their beliefs.

Courts have defined "substantial burden" under the RFRA differently.[74] This circuit's courts have not addressed the issue. The court finds Chief Judge Posner's formulation in *Mack v. O'Leary* to best effectuate Congress' intent. In *Mack*, the court stated:

[A] substantial burden on the free exercise of religion, within the meaning of the Act, is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.[75]

The court finds this formulation of "substantial burden" to be appropriate because a more exacting standard would make "judges arbiters of religious law" and would have the court "determine what practices [Jackson and Wolfe's] religion[s] obligate[ ] [them] to follow" by identifying and interpreting "the authoritative sources of law" for Islam and Rastafarianism.[76] This the court cannot and shall not do.

Under the standard just articulated, the court finds plaintiffs have met their burden of showing that Virginia Corrections' grooming policy substantially burdens their exercise of religion. The court found Jackson and Wolfe's testimony to be heartfelt and sincere. By a preponderance of the evidence, the court finds that Jackson grows his beard and Wolfe his beard and dreadlocks because of their religious beliefs. Virginia Corrections' grooming policy would force them to refrain from these practices in their entirety and therefore imposes at least a substantial burden if not more. The production and persuasion burdens now shift to defendants.

### 2. COMPELLING INTEREST

Before evaluating the interests allegedly served by the grooming policy, the court addresses plaintiffs' dual theories of the case. To reiterate, plaintiffs claim that Virginia Corrections acts as defendants' agent and defendants have a continuing responsibility, by virtue of their retained legal custody, to prevent trammeling of plaintiffs' rights. In their post-trial brief,

---

73. *See* 42 U.S.C.A. § 2000bb–2(3) (West 1994); *see also, e.g., May v. Baldwin,* 109 F.3d 557, 562–63 (9th Cir.1997).

74. *See Mack v. O'Leary,* 80 F.3d 1175, 1178 (7th Cir.1996) (citing cases).

75. *Id.* at 1179.

76. *See id.*

plaintiffs argue that defendants failed to demonstrate a compelling interest in having plaintiffs remain in Virginia Corrections' custody in light of the grooming policy. This argument addresses plaintiffs' theory of "continuing responsibility" alone; it does not touch on whether Virginia, the defendants' agent, has a compelling interest in enforcing the grooming policy. Given the court's finding of agency, defendants may, of course, raise any defenses available to Virginia Corrections. Even without agency, under plaintiffs' "continuing responsibility" theory, the court must review the reasons for Virginia Corrections' grooming policy to evaluate whether defendants are indeed sitting idly as plaintiffs' rights are violated. As the court finds that the grooming policy passes scrutiny under the RFRA, the court declines to evaluate whether defendants have compelling interests in keeping plaintiffs incarcerated in Virginia Corrections facilities.

Plaintiffs have not challenged the proposition that the interests allegedly served by the grooming policy are "compelling." These interests basically number four, and are accompanied by illustrative incidents that Virginia Corrections officials testified they considered when creating the grooming policy. First, Virginia Corrections wished to arrest inmate concealment of contraband in long hair and beards and improve prison security. Virginia Corrections officials testified that officers had in the past discovered ice picks, illicit drugs, drug paraphernalia, handcuff keys, wires, and clippers secreted in inmates' long facial and head hair. Second, Virginia Corrections sought to reduce gang activity. Michael Moore, D.C. Defendants' expert witness and himself head of Florida's pris-

on system, testified that inmate gangs often evolve from informal groups into structured entities that engage in organized crime. These gangs can employ radical hairstyles to set members apart from other inmates.

Third, Virginia Corrections sought to improve its ability to identify inmates, both within the institution and upon escape. A number of instances were recounted at trial in which inmates had shorn themselves of long hair and/or beards and had tried to escape.[77] Fourth, Virginia Corrections wished to improve inmate health and sanitation. Virginia Corrections officials recounted instances of an inmate who suffered repeated rashes caused by bites from black-widow spiders living in his unkempt, long hair and another inmate whose cellmate murdered him on account of his failure to keep himself clean.

Other courts that have considered the same interests in prisoner challenges to prison-grooming policies under the RFRA have found them compelling.[78] The court does so here as well, and next considers whether the grooming policy is the least restrictive means of meeting these interests.

## 3. THE LEAST RESTRICTIVE MEANS

When considering whether Virginia Corrections' policy is the least restrictive means of effectuating prison officials' interests in prison security, gang prevention, inmate identification, and health and sanitation, the court is mindful of the Supreme Court's pronouncements regarding the deference due to the judgment of prison

77. A particularly stark example is seen in BOP Ex. 7, which shows pictures, in sequence, that show the escapee's picture upon recapture, the escapee's picture on file with the institution that was distributed to law-enforcement officials searching for him, and the mock-up (with locks of the escapee's long hair) which the escapee placed in his cell.

78. *See Diaz v. Collins*, 114 F.3d 69, 73 (5th Cir.1997) (security); *May*, 109 F.3d at 563 (security); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir.1996) (security, contraband, identification); *Hamilton v. Schriro*, 74 F.3d 1545, 1555 (8th Cir.1996) (security, contraband, gangs).

administrators.[79] The Senate Committee Report on the RFRA pointedly refers to this deference and states "the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators."[80] The Committee Report further cautions that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice...."[81] The court, in keeping with the Supreme Court's guidance, must avoid both substituting its judgment for that of Virginia Corrections officials and rubber-stamping their stated rationale.

Defendants have offered, chiefly through the testimony of Virginia Corrections officials, a number of reasons why the grooming policy is the least restrictive means of furthering their compelling interests. Responding to a suggestion that inmate self-searching might serve the interest of arresting contraband and weapons concealed in hair, D.C. Defendants' expert witness Moore explained why such a methodology is unsatisfactory. Plaintiff Wolfe demonstrated in court how self-examination might occur: he bent forward at the waist and allowed his hair to hang freely, then ran his hands back and forth through his dreadlocks. Moore, having viewed Wolfe's demonstration, credibly testified that such an inspection would be insufficient to ferret out contraband, as the inmate could selectively avoid items hidden in his own hair.

Second, defendants believe it unwise to have prison guards thoroughly search by hand inmates' hair and beards. Moore again believably testified that this type of

procedure would be difficult to administer given limited prison staff and would be perceived by inmates as too intrusive. He distinguished a pat-down, where the prison guard pats down an inmate's clothing and body, from the "constant touch" involved with running fingers through an inmate's hair.[82] Further, prison guards have been injured performing such searches by razor blades secreted in inmates' hair.

Third, defendants proffer that it would be infeasible for prison officials to grant a "religious exception" to the grooming policy. A number of witnesses testified that inmates might simply claim to switch religions to avoid the policy. More importantly, such an exception would require prison officials to determine whether inmates sincerely hold their religious beliefs. As the court itself hesitates to make this determination, it can understand why prison officials are similarly reticent.

Plaintiffs did not present any evidence regarding the "least restrictive means" issue, choosing instead to rely on cross examination of defendants' witnesses and the ineluctable clarity and force of their arguments. For example, plaintiffs established through the testimony of Virginia Corrections' Director Angelone that Virginia Corrections had a grooming policy in place prior to the new policy that likely would have accommodated plaintiffs' interests in not shaving or cropping their head hair in observance of their religion, but that it was not enforced. Observing that Virginia Corrections' interests in safety and prisoner identification have not changed over time, plaintiffs argue that enforcement of the old policy would be a less restrictive alternative to Virginia Corrections' new

**79.** *See, e.g., Sandin v. Conner,* 515 U.S. 472, 482–83, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.") (citations omitted); *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (courts have "accorded wide-ranging deference [to prison officials] in the adoption and execution of policies and practices that in their judgment are needed to

preserve internal order and discipline and to maintain institutional security.") (citations omitted).

**80.** S.Rep. No. 103–111 (1993), at 10.

**81.** *Id.*

**82.** Tr. at 533.

grooming policy. This sort of argument calls for the court to repose its judgment in place of prison officials who are presumably better situated to decide. Director Angelone testified that when he and his staff began formulating the present grooming policy in 1995, a number of changes to Virginia's criminal-justice system had recently taken place. For example, parole had been abolished, inmates were required to serve 85 percent of their sentence, and Virginia adopted a three-strikes statute. Director Angelone and his team decided that a new grooming policy would be needed to effectively maintain security and safety. The court has no reason to doubt this explanation.

Plaintiffs also argue that the exceptions to the grooming policy which Virginia Corrections officials permit for prisoners with a medical condition that prevents shaving or cropped hair or who are pursuing a cosmetology certification cripples the assertion that the grooming policy is the least restrictive means by which to accomplish the interests allegedly served by the policy. The court rejects plaintiffs' argument because neither exception affects prison security, gang elimination, inmate identification, or sanitation and health. The cosmetological exception is of little relevance, as inmates hair is dyed in the same color range. And unlike a religious exception, the grooming policy's medical exception is objectively determinable by a medical professional who, of course, already has the requisite training to identify when to invoke it.

Plaintiffs further argue that Virginia Corrections' decision not to apply the grooming policy to hundreds of inmates from Michigan belies defendants' claim that the policy is the least restrictive means of furthering their interests in prison security, gang elimination, inmate identification, and health and sanitation. At trial, Virginia Corrections' Director Angelone explained that this exemption was given solely because Michigan was removing its inmates from Virginia Corrections facilities and Michigan did not itself have a grooming policy. Virginia Corrections' Deputy Director Morris explained that of the 300 to 400 Michigan inmates in Virginia Corrections facilities, about 80 had been removed per week. Though the grooming policy's effectiveness may have been diminished to some degree by the exempted Michigan inmates (no party presented evidence concerning the number of Michigan inmates out of compliance with the grooming policy), the court finds that this fact alone is insufficient to indicate a less restrictive alternative was available. This is exactly the sort of decision courts traditionally leave to the discretion of prison officials.

Perhaps plaintiffs' strongest argument is this: surely D.C. Corrections and BOP have an interest in security, gang prevention, inmate identification, and health and sanitation in their facilities that is as compelling to defendants as it is to Virginia Corrections. However, D.C. Corrections' and BOP's prison officials have not found it necessary to institute a grooming policy like the one instituted by Virginia Corrections. How can it be said then that Virginia Corrections' grooming policy is the least restrictive means to serve this common interest? This argument is patently flawed. To accept the logic of this argument the court would have to conclude that the least restrictive means necessary to serve the interests of one jurisdiction's prison system is the only lawful means to serve the same interests of another jurisdiction's system though they may be entirely different in terms of their history, inmate population, structure and funding. To state this proposition is to refute it. The drafters of the RFRA did not intend to require a "one size fits all" approach to evaluating rules of neutral applicability in any context and certainly not in the context of prison condition litigation.

Finally, in evaluating whether the Virginia Corrections grooming policy is the least restrictive means necessary to meet interests found to be compelling, the court

observes that every circuit that has reviewed a grooming policy like the one at issue here has found that it meets the RFRA's "least restrictive means" requirement.[83]

## F. FREE EXERCISE CLAUSE

 Free Exercise claims by prisoners are gauged by a different standard than such claims by the unfettered. In *O'Lone v. Shabazz*, the Supreme Court explicated the standard: " 'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[84] As the court has found Virginia Corrections' grooming policy to pass muster per the RFRA's heightened-scrutiny standard, it of course passes the *O'Lone* test.

Plaintiffs argue that because Virginia Corrections' grooming policy contains medical and cosmetological exceptions and an accommodation for Michigan inmates but no religious exemption, it is subject to heightened scrutiny. Plaintiffs mainly rely upon *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark* to support their proposition.[85] In *Fraternal Order*, Sunni Muslim police officers challenged on Free Exercise grounds a department regulation that prohibited beards. The court applied intermediate scrutiny to the regulation, based in part upon the Supreme Court's statement that "in circumstances in which individualized exemptions from a general requirement are available, the gov-

ernment 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.' "[86]

Plaintiffs wrongly assume *Fraternal Order* is similar to this case. Though the grooming policy and medical exception at issue here are nearly identical to those considered in *Fraternal Order*, there is one pivotal difference: plaintiffs here are in prison. In any event, even if heightened scrutiny applied, the court has already vindicated Virginia Corrections' grooming policy under the RFRA's standard, which is substantially similar to that articulated in *Newark Lodge*.

## III. CONCLUSION

Defendants are entitled to judgment because plaintiffs failed to exhaust their administrative remedies. Further, though Virginia Corrections' grooming policy substantially burdens plaintiffs' sincerely held religious beliefs, it is the least restrictive means to effectuate Virginia Corrections' compelling interests in prison security, gang elimination, inmate identification, and health and sanitation.

---

83. *See Diaz v. Collins*, 114 F.3d at 73; *May*, 109 F.3d at 563–65; *Harris v. Chapman*, 97 F.3d at 504; *Hamilton v. Schriro*, 74 F.3d at 1555.

84. *See* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *but see Werner v. McCotter*, 49 F.3d 1476 (10th Cir.1995) ("The recent passage of the Religious Freedom Restoration Act of 1993 ... legislatively overturned a number of recent Supreme Court decisions, including *Turner* and *Shabazz*, by defining a statutory (if not a constitutional) right to the free exercise of religion."), *over-*

*ruling recognized by Sinnett v. Simmons*, 45 F.Supp.2d 1210 (D.Kan.1999) ("In 1997, in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the United States Supreme Court declared that RFRA is unconstitutional. *Boerne* effectively overruled *Werner*....").

85. 170 F.3d 359, 365 (3rd Cir.1999).

86. *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537, 113 S.Ct. 2217, 2229, 124 L.Ed.2d 472 (1993) (citing *Employment Div. v. Smith*, 494 U.S. 872, 884, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876 (1990) (citation omitted)).