Louis JACKSON, on behalf of himself
and others similarly situated, et
al., Appellants,

v.

DISTRICT OF COLUMBIA,
et al., Appellees.

No. 00–5103.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 12, 2001.

Decided July 10, 2001.

E. Desmond Hogan argued the cause for appellants. With him on the briefs were Jonathan L. Abram, William S. Haft and Arthur B. Spitzer.

Edward E. Schwab, Assistant Corporation Counsel, argued the cause for appellee District of Columbia. With him on the brief were Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Lutz Alexander Prager, Assistant Deputy Corporation Counsel.

Michael A. Humphreys, Assistant U.S. Attorney, argued the cause for appellee Bureau of Prisons. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: HENDERSON, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Rastafarian and Sunni Muslim prisoners challenge a prison grooming policy that forbids beards and long hair, arguing that the policy violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act. Although the district court found that the prisoners failed to exhaust their administrative remedies as required by the Prison Litigation Reform Act, the court went on to hold that the policy violated neither the First Amendment nor the Religious Freedom Restoration Act. The prisoners appeal, arguing that for statutory, procedural, and constitutional reasons, the exhaustion requirement does not apply to them. Agreeing with the district court that the prisoners failed to exhaust their administrative remedies, we remand with instructions to vacate in part and dismiss the complaint without prejudice.

## I

The National Capital Revitalization and Government Improvement Act of 1997 requires the District of Columbia to close the Lorton Correctional Complex by December 31, 2001. D.C. CODE § 24–1201(b). The Act instructs the District to transfer its prisoners to facilities operated by the Federal Bureau of Prisons ("BOP"). *Id.* Because BOP has insufficient space to accommodate all D.C. prisoners, the District contracted to transfer over 1000 prisoners to Virginia Department of Corrections ("VDOC") facilities. BOP also transferred an additional 900 District inmates in its custody to VDOC prisons.

On November 15, 1999, VDOC announced new grooming standards for all inmates in its prisons. For male inmates, the policy prohibits beards and goatees, requires hair to be cut above the shirt collar, and bans hairstyles "such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, [or] designs cut into the hair." *Inmate Grooming Standards*, Va. Dep't of Corr., Procedure No. DOP 864, at 2 (Nov. 15, 1999). The policy also imposes grooming requirements on female prisoners, but permits their hair to be shoulder-length. Penalties for violating the policy include assignment to special housing; termination of most visitation, telephone, and commissary privileges; and suspension from work and other activities. *Id.* at 3. If on arrival a new prisoner "refuses to cooperate, use of ... force/restraints is authorized in order to bring the inmate into compliance with grooming standards." *Id.*

Louis Jackson, Isadore Gartrell, Carl Wolfe, and Roddy McDowell, appellants, are serving D.C. sentences at the VDOC Sussex II prison in Waverly, Virginia. They brought this action in the United States District Court for the District of Columbia on behalf of themselves and oth-

er D.C. prisoners, principally Sunni Muslims and Rastafarians, who are housed in Virginia facilities and who believe their religious faiths forbid them from cutting their hair, shaving their beards, or both. In their complaint, the prisoners alleged that the grooming policy violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb–4. RFRA forbids the government from "substantially burden[ing] a person's exercise of religion" unless the government can "demonstrate[ ] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb–1(b). Congress enacted RFRA to protect one of "the most treasured birthrights of every American"—"the right to observe one's faith, free from Government interference." S.REP. No. 103–111, at 4 (1993). Although the Supreme Court has declared RFRA unconstitutional as applied to the states, *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), we have assumed, without deciding, that "RFRA applies to the federal government, notwithstanding the Supreme Court's decision in … *Boerne*." *Alamo v. Clay*, 137 F.3d 1366, 1368 (D.C.Cir.1998); *cf. Henderson v. Kennedy*, 253 F.3d 12 (D.C.Cir. 2001). We shall continue that assumption here.

The prisoners made two basic claims in the district court. First, they contended that VDOC lacked a compelling interest in the grooming policy and that the policy was not the least restrictive means of achieving whatever interests VDOC had. Alternatively, they argued that BOP and the District had a less restrictive means of housing prisoners who believed that the grooming policy required them to violate fundamental religious tenets: transferring them to non-Virginia prison facilities without such grooming policies.

On December 14, 1999, one day before the grooming policy's effective date, the district court issued a temporary restraining order preventing the policy from being applied to any District inmate with "sincerely held religious beliefs the new grooming policy would compromise." Order Granting T.R.O., *Jackson v. District of Columbia*, No. 99–03276 (D.D.C. Dec.14, 1999). Shortly thereafter, BOP filed a motion to intervene as a defendant, explaining that it has a contract with VDOC to house former Lorton inmates now in BOP's care. The district court granted BOP's motion, and the prisoners filed an amended complaint to include BOP prisoners in the class.

To comply with the TRO, BOP implemented a screening procedure to identify prisoners' religious preferences before assigning them to VDOC facilities. Sunni Muslim and Rastafarian prisoners were sent to facilities outside Virginia that did not require them to cut their hair or shave their beards.

Following discovery and trial, the district court ruled that the prisoners had failed to exhaust VDOC's grievance procedures and had thus not complied with the Prison Litigation Reform Act's ("PLRA") requirement that "[n]o action … be brought with respect to prison conditions under … any … Federal law[ ] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a). *See Jackson v. District of Columbia*, 89 F.Supp.2d 48, 63 (D.D.C.2000). Explaining, however, that "considerable resources [had been] devoted to the presentation of evidence," and that appellate review was "certain," *id.* at 64, the court went on to consider the

merits of the case. Ruling against the prisoners, the court concluded that although the prisoners' belief that they could not cut their hair was "heartfelt and sincere," *id.* at 65, and although they had demonstrated that the grooming policy "substantially burdens their exercise of religion," *id.*, the prison interests served by the policy were compelling, and VDOC had no less restrictive alternatives, *id.* at 66–69. The district court entered "judgment for defendants." *Id.* at 50. In doing so, the court "decline[d] to evaluate" the issue raised by the prisoners' alternative claim: "whether defendants have compelling interests in keeping plaintiffs incarcerated in Virginia Corrections facilities." *Id.* at 66.

The prisoners appeal, arguing that: (1) the PLRA's exhaustion requirement does not apply to them; (2) the district court erred in failing to read an irreparable harm exception into the exhaustion requirement; and (3) in any event, two class members successfully exhausted available administrative remedies. On the merits, they press only their alternative argument that BOP and the District could assign them to prisons without grooming policies, as BOP did to comply with the TRO.

## II

In support of their claim that the district court erred in applying the PLRA's exhaustion requirement to them, the prisoners argue that the PLRA does not apply to RFRA actions and that the District and BOP waived the exhaustion defense by failing to include it in their answers. We address each argument in turn.

■ The prisoners' first argument rests on two provisions of RFRA. Entitled "Judicial relief," one provision establishes that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the Constitution." 42 U.S.C. § 2000bb–

1(c). The second provision, entitled "Rule of construction," states that "[f]ederal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter." *Id.* § 2000bb–3(b). According to the prisoners, these two provisions allow them to pursue their RFRA action without first complying with the PLRA's exhaustion requirement. They argue that because nothing in the PLRA—a "Federal statutory law adopted after November 16, 1993"—"explicitly excludes ... application" of RFRA's "Judicial relief" provision, courts may condition the filing of RFRA actions on nothing more than "the general rules of standing under Article III of the Constitution."

We disagree. The prisoners read the statute as if it said, "Article III standing is the only requirement for RFRA suits." The statute actually says only that "*[s]tanding ...* shall be governed by the general rules of standing under Article III of the Constitution." *Id.* § 2000bb–1(c) (emphasis added). Describing the purpose of the "Judicial relief" provision, the Senate Report on the bill refers only to standing, saying nothing at all about other requirements for suit.S.REP. No. 103–111, at 13 ("Ordinary article III rules are to be applied in determining whether a party has standing to bring a claim pursuant to this act."). If the prisoners' reading of the statute were correct, courts would have to disregard not only the PLRA exhaustion requirement, but also such basic matters as personal jurisdiction, venue, and statutes of limitations. Neither the statute nor its legislative history suggests that Congress intended such an astonishing result.

The prisoners argue that because all federal court plaintiffs must satisfy Article III standing, *see Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343

(1975), limiting the "Judicial relief" section to standing would leave the section "utterly without effect[,] contravening an elementary principle of statutory construction." Appellants' Reply Br. at 3 (internal quotation omitted). Again, we disagree. The Senate Report makes clear that Congress included the provision in order to emphasize that RFRA should not "have [the] unintended consequence[ ]" of "unsettl[ing]" standing law. S.REP. No. 103–111, at 12–13. "The committee intends that [standing] issues *continue to* be resolved under Article III standing rules and establishment clause jurisprudence. The Act would not provide a basis for standing in situations where standing to bring a free exercise claim is absent." *Id.* at 13 (emphasis added). Although it may be unusual for Congress to include language in a statute merely to emphasize its intention not to change a particular aspect of existing law, that appears to be precisely what Congress did here.

■ The prisoners' second argument is that even if the PLRA's exhaustion requirement applies to RFRA suits, BOP and the District waived the defense by failing to include it in their answers to the original complaint. BOP did not raise its exhaustion defense until it answered the first amended complaint; the District raised the defense in a "notice" that it was joining BOP's exhaustion defense. *See Jackson,* 89 F.Supp.2d at 58 n. 46. Treating the District's notice as a motion to amend its answer to plaintiffs' first amended complaint, the district court concluded that granting the motion would not prejudice the prisoners because they had learned of the defense two weeks earlier when BOP identified two witnesses who would testify on the subject of exhaustion. *Id.*

■ Challenging the district court's decision, the prisoners cite *Harris v. Sec'y,*

*U.S. Dep't of Veterans Affairs,* 126 F.3d 339 (D.C.Cir.1997), for the principle that "affirmative defenses must be raised in a responsive pleading." *Id.* at 341. But *Harris* also emphasizes that district courts retain discretion to grant leave to amend pleadings to include new defenses, *id.* at 344–45, just as the district court did here. We review district court decisions regarding amendments of pleadings for abuse of discretion, *see Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 146 F.3d 983, 991 (D.C.Cir.1998), recognizing that leave to amend should be "freely given when justice so requires," FED.R.CIV.P. 15(a), absent "any apparent or declared reason— such as undue delay, bad faith[,] . . . [or] undue prejudice to the opposing party," *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Not until their reply brief did the prisoners argue that any such reason existed in this case. This argument came too late. *See Corson & Gruman Co. v. NLRB,* 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond.").

## III

■ The prisoners argue that the district court erred by refusing to recognize an irreparable injury exception to the PLRA's exhaustion requirement. "Under the district court's interpretation [that the PLRA's exhaustion requirement lacks an irreparable harm exception], the PLRA prevents a prisoner who is subject to daily torture from seeking an injunction until he exhausts a six-month (or longer) prison grievance procedure." Appellants' Opening Br. at 15 n.3. Such an exception is necessary, the prisoners argue, "in order

to avoid ... serious constitutional questions." *Id.*

■ We think an irreparable injury exception is unnecessary. The Supreme Court has long recognized that federal courts possess a "traditional power to issue injunctions to preserve the *status quo* while administrative proceedings are in progress and prevent impairment of the effective exercise of appellate jurisdiction." *FTC v. Dean Foods Co.*, 384 U.S. 597, 604, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). As we explained in *Wagner v. Taylor*, "[i]f [a] court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction, despite the agency's primary jurisdiction, gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review." 836 F.2d 566, 571 (D.C.Cir.1987). In *Wagner*, we found that although Title VII complainants must ordinarily exhaust administrative remedies before seeking judicial relief, *id.* at 570 n. 34, because Title VII does not expressly foreclose courts' "inherent equitable power to issue ... injunctions to preserve the status quo," *id.* at 572, district courts retain jurisdiction to grant interim injunctive relief where plaintiffs face either irreparable injury or imminent retaliation. *Id.* at 574–76; *see also Nat'l Treasury Employees Union v. King*, 961 F.2d 240 (D.C.Cir.1992) (responding to the union's argument that it would suffer irreparable injury to its First Amendment rights during the time that the Federal Labor Relations Authority considered its unfair labor practice claim by ordering the district court to hold the case in abeyance for three months or until the FLRA decided the union's claim, and instructing the district court, in order to prevent the union from suffering irreparable injury, to hear the claim at the end of that period if the FLRA had not acted on the claim); *cf.*

*Sampson v. Murray*, 415 U.S. 61, 84, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (explaining that a showing of irreparable injury would be necessary to justify preliminary injunctive relief staying agency action during the agency's appeals process).

Like Title VII, the PLRA contains nothing expressly foreclosing courts from exercising their traditional equitable power to issue injunctions to prevent irreparable injury pending exhaustion of administrative remedies. The district court therefore had no need to recognize an irreparable injury exception to the PLRA's exhaustion requirement; the court had inherent power to protect the prisoners while they exhausted prison grievance procedures. Of course, the district court had no need to exercise that authority in this case, for by the time BOP raised its exhaustion defense, the court had issued a temporary restraining order that, by agreement of the parties, remained in effect until the court ruled on the merits.

## IV

This brings us to the question of whether the prisoners exhausted their administrative remedies as required by the PLRA. VDOC's grievance procedures have four stages, but only the first two relate to this case. A prisoner begins by filing an informal complaint with prison staff. The staff must respond in writing within fifteen days. If unsatisfied with the response, the prisoner may file a Level I formal grievance within thirty days of the occurrence, to which the prison must respond within thirty days (or sixty days if the prison issues a "continuance"). Inmates are notified of the grievance procedures "during orientation at all reception centers and all parole violator units," and copies are made available "in locations accessible to both employees and inmates." *Inmate Griev-*

*ance Procedure,* Va. Dep't of Corr., Procedure No. DOP 866, at 3–4 (Nov. 20, 1998).

The prisoners argue that class members Louis Jackson and Carl Wolfe exhausted their administrative remedies. *See Foster v. Gueory,* 655 F.2d 1319, 1321–22 (D.C.Cir.1981) (explaining that each individual plaintiff in a class-action suit need not have pursued the available administrative remedies "if at least one member of the plaintiff class has met the filing prerequisite"). Jackson filed an informal complaint on December 1, 1999, but never received a response. Relying on their understanding that the response to an informal complaint must be attached to a Level I grievance, the prisoners argue that Jackson could not file a Level I formal grievance since he had no response to attach. According to the district court, however, even if the filing of an informal complaint to which prison officials fail to respond satisfies the PLRA, Jackson's filing did not. As the district court observed, because prison officials have fifteen days to respond to an informal complaint, Jackson's December 1 complaint was still pending when the prisoners filed suit on December 10, 1999. *See Jackson,* 89 F.Supp.2d at 59–60.

■ In so ruling, the district court rejected the prisoners' argument that the PLRA permits suit to be filed so long as administrative remedies are exhausted before trial. "[T]he statute means what it plainly says," the district court held; "prisoners may only file actions under federal law concerning their conditions of confinement after they have exhausted their prison's administrative remedies." *Id.* at 59. We agree, as do three other circuits. *See Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir.1999); *Perez v. Wis. Dep't of Corr.,* 182 F.3d 532, 534–35 (7th Cir.1999); *Garrett v. Hawk,* 127 F.3d 1263, 1265 (10th Cir.1997). *But see Williams v. Norris,* 176 F.3d 1089, 1090 (8th Cir.1999) (holding that it is sufficient for prisoners to exhaust their remedies before trial). The PLRA says that no action shall be *"brought . . .* until such administrative remedies as are available are exhausted," not that no action shall be *tried* until administrative remedies are exhausted. 42 U.S.C. § 1997e(a) (emphasis added).

■ The prisoners next argue that Jackson satisfied their PLRA exhaustion obligation because, by the date they filed their amended complaint (January 18, 2000), the deadline for the prison's response to Jackson's informal complaint had passed. But if the PLRA meant only that prisoners had to exhaust administrative remedies before filing an amended complaint, they would have no incentive to exhaust those remedies prior to filing suit. The prisoners could complete the grievance process while suit was pending, avoiding dismissal by later amending their complaint. This would defeat the very purpose of the PLRA exhaustion requirement: relieving courts of the burden of lawsuits filed before prison officials have had an opportunity to resolve prisoner grievances on their own. *See Alexander v. Hawk,* 159 F.3d 1321, 1326 n. 11 (11th Cir.1998).

■ Class member Carl Wolfe's argument that he exhausted his administrative remedies rests on his claim that he complained about the grooming policy to three prison officials, one of whom—the warden—told him "to file in the court." Trial Tr. 2/29/2000 at 62. Relying on *Miller v. Tanner,* 196 F.3d 1190 (11th Cir.1999), the prisoners argue that "[t]he PLRA's exhaustion requirement does not require a prisoner to pursue an administrative procedure that prison officials have expressly told him is not available to cure the inmate's complaint." Appellants' Opening Br. at 25.

In *Miller*, prison officials moved to dismiss a prisoner's complaint for failure to comply with the PLRA's exhaustion requirement because the prisoner did not appeal following the rejection of his grievance. 196 F.3d at 1192, 1194. Yet the letter the prisoner received from the grievance clerk denying his grievance stated that "[w]hen any grievance is terminated at the institutional level you do not have the right to appeal. The above listed grievance[ ] is closed." *Id.* at 1192. The Eleventh Circuit found that this letter "unambiguously told [the prisoner] that an appeal was futile, even prohibited." *Id.* at 1194. Observing that "appealing might be treated as insubordination and there might be harmful consequences for disobeying the rules," the court concluded that "[the prisoner] was not required, in order to exhaust his administrative remedies, to file an appeal after being told unequivocally that appeal of an institutional level denial was precluded." *Id.*

This case differs from *Miller* in two significant respects. To begin with, the record in this case contains no "unambiguous" or "unequivocal" (the Eleventh Circuit's words) statement that Wolfe had exhausted the prison's grievance procedures. Indeed, we find nothing in the record to support the prisoners' claim that Wolfe was told "that he had no recourse through VDOC's grievance process," or that Wolfe's "only option for challenging the policy was to file in court." Appellants' Opening Br. at 25. The warden never even mentioned the grievance procedures; he said only "there [was] nothing he [could] do" and that Wolfe had to "file in the court," Trial Tr. 2/29/2000 at 62. And under the PLRA, a prisoner must exhaust his administrative remedies before going to court. Moreover, as we read Wolfe's entire description of the warden's statement, which the prisoners fail to quote in their brief, the warden seems to have meant only that Wolfe had to file suit if he wanted a transfer to a District facility:

> I asked him first if he could get me transferred back to the District of Columbia being that I'm a Rastafarian and this policy is totally against Rastafarian as far as cutting my hair, shaving my face. I explained my whole religious policy to him. He said there is nothing he can do for me. The only thing I can do, I got to file in the court.

*Id.* at 62–63.

Second, the prisoners in this case never allege that Wolfe risked discipline if he pursued a grievance. Quite to the contrary, despite the warden's statement that Wolfe had "to file in the court," Wolfe filed an informal complaint with his unit manager and, after receiving a negative response, filed a Level I formal grievance. *Id.* at 66; Trial Tr. 3/1/2000 at 300. When that grievance was rejected, he filed a Level II appeal. He was still waiting for a response when trial in the district court began. Trial Tr. 2/29/2000 at 66–67.

It is thus clear from the record that Wolfe had not exhausted his administrative remedies at the time of trial, let alone when the prisoners filed their complaint. Mindful of the Supreme Court's recent statement that Congress intended the PLRA to broaden the exhaustion requirement for prisoner suits, *see Booth v. Churner*, No. 99–1964, 2001 WL 567712, at *5 (U.S. May 29, 2001), we agree with the district court that Wolfe failed to comply with the PLRA.

V

Because the prisoners failed to exhaust their administrative remedies, the district court should have dismissed the complaint without prejudice, allowing the prisoners to refile once they have completed the

VDOC grievance procedures. *See Martini v. Fed. Nat'l Mortgage Ass'n,* 178 F.3d 1336, 1348 (D.C.Cir.1999). Because the merits of the RFRA claim have been fully briefed in this appeal, however, and because the district court might have to consider this claim on remand, we close with one observation. *See id.* at 1349 (commenting on the merits of one of the issues on appeal despite this court's dismissal of the appellant's complaint because of the possibility that "this issue [would] arise again in a new trial"). In evaluating the merits of the prisoners' RFRA claim, the district court expressly "decline[d]" to consider the issue presented by the prisoners' alternative contention, the one they appeal here. Therefore, should the prisoners refile after exhausting their administrative remedies, the district court will need to consider whether BOP and the District can demonstrate that alternative placement in non-Virginia prisons without grooming policies is infeasible. *See, e.g., Jolly v. Coughlin,* 76 F.3d 468, 479 (2d Cir.1996) (requiring a prison sued under RFRA to prove that its treatment of the plaintiff was "the least restrictive means to further [its] asserted compelling interest").

The portions of the district court decision regarding the merits (Sections IIE, IIF, and III) are vacated, and this matter is remanded with instructions to dismiss the complaint without prejudice.

*So ordered.*