GORSUCH, joined by KELLY and TYMKOVICH, Circuit Judges,
concurring.
Judge Tymkovieh explains why Hobby Lobby and Mardel are entitled to a preliminary injunction. I write to explain why the Greens themselves, as individuals, are also entitled to relief and why the Anti-Injunction Act does not preclude us from supplying that relief.
All of us face the problem of complicity. All of us must answer for ourselves whether and to what degree we are willing to be involved in the wrongdoing of others. For some, religion provides an essential source of guidance both about what constitutes wrongful conduct and the degree to which those who assist others in committing wrongful conduct themselves bear moral culpability. The Green family members are among those who seek guidance from their faith on these questions. Understanding that is the key to understanding this case.
As the Greens explain their complaint, the ACA’s mandate requires them to violate their religious faith by forcing them to lend an impermissible degree of assistance to conduct their religion teaches to be gravely wrong. No one before us disputes that the mandate compels Hobby Lobby and Mardel to underwrite payments for drugs or devices that can have the effect of destroying a fertilized human egg. No one disputes that the Greens’ religion teaches them that the use of such drugs or devices is gravely wrong.[1] It is no less clear from the Greens’ uncontested allegations that Hobby Lobby and Mardel cannot comply with the mandate unless and until the Greens direct them to do so — that they are the human actors who must compel the corporations to comply with the mandate. And it is this fact, the Greens contend, that poses their problem. As they understand it, ordering their companies to provide insurance coverage for drugs or devices whose use is inconsistent with their faith itself violates their faith, representing a degree of complicity their religion disallows. In light of the crippling penalties the mandate imposes for failing to comply with its dictates — running as high as $475 million per year — the Greens contend they confront no less than a choice between exercising their faith or saving their business.
No doubt, the Greens’ religious convictions are contestable. Some may even find the Greens’ beliefs offensive. But no one disputes that they are sincerely held religious beliefs. This isn’t the case, say, of a wily businessman seeking to use an insincere claim of faith as cover to avoid a financially burdensome regulation. See United States v. Quaintance, 608 F.3d 717 (10th Cir.2010) (an example of just that). And to know this much is to know the terms of the Religious Freedom Restoration Act apply. The Act doesn’t just apply to protect popular religious beliefs: it does *1153 perhaps its most important work in protecting unpopular religious beliefs, vindicating this nation’s long-held aspiration to serve as a refuge of religious tolerance.
The Greens’ claim in this case closely parallels claims the Supreme Court vindicated in Thomas and Lee. In Thomas, the plaintiff, a faithful Jehovah’s Witness, was willing to participate in manufacturing sheet steel he knew might find its way into armaments, but he was unwilling to work on a fabrication line producing tank turrets. Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 711, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1980). That’s the line he understood his faith to draw when it came to complicity in war-making, an activity itself forbidden by his faith. The Supreme Court acknowledged this line surely wasn’t the same many others would draw, and that it wasn’t even necessarily the same line other adherents to the plaintiffs own faith might always draw. But the Court proceeded to hold that it was not, is not, the place of courts of law to question the correctness or the consistency of tenets of religious faith, only to protect the exercise of faith. Id. at 714-16, 101 S.Ct. 1425. No different result can reasonably follow here.
In Lee, a devout Amish employer refused to pay social security taxes on behalf of his employees. See United States v. Lee, 455 U.S. 252, 254-55, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). The employer’s faith taught that it is sinful to accept governmental assistance. By being forced to pay social security taxes on behalf of his employees, the employer argued, he was being forced to create for his employees the possibility of accepting governmental assistance later. This much involvement or complicity, the employer argued, was itself sinful under the teachings of his religion. The government argued there— much as the government argues here— that the enforcement of its mandate on the employer would “not threaten the integrity of the [employer’s] religious belief’ because the employer didn’t have to accept social security benefits himself and his employees could choose for themselves whether to do so. See Lee, 455 U.S. at 257, 102 S.Ct. 1051; Brief for Gov’t, Lee (No. 80-767), 1981 WL 389829, at *10 (June 5, 1981). The Supreme Court squarely rejected this argument in language no less applicable to our case, explaining that it is not within “the judicial function and competence ... to determine whether the Government has the proper interpretation of the Amish faith.” 455 U.S. at 257,102 S.Ct. 1051.
The district court reached a different result only because it mistook the nature of the Greens’ objection. As the district court described it, “the particular burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by Hobby Lobby’s plan, subsidize someone else’s participation in an activity that is condemned by plaintiffs religion.” Order at 23 (Nov. 19, 2012), ECF No. 45 (emphasis added). The dissent proceeds along the same lines today, asserting that the Greens have no claim because they do not “become a party to, or otherwise encourage, an individual employee’s decision to use a particular drug or device.” Briscoe Op. at 1178. All this, however, mistakes or rewrites the Greens’ sincerely held religious convictions. As the Greens describe it, it is their personal involvement in facilitating access to devices and drugs that can have the effect of destroying a fertilized human egg that their religious faith holds impermissible. And as we have seen, it is not for secular courts to rewrite the religious complaint of a faithful adherent, or to decide whether a religious teaching about complicity imposes “too much” moral disap *1154 proval on those only “indirectly” assisting wrongful conduct. Whether an act of complicity is or isn’t “too attenuated” from the underlying wrong is sometimes itself a matter of faith we must respect. Thomas and Lee teach no less.[2]
With that much in mind, it is beyond question that the Greens have Article III standing to pursue their claims individually. This is so not simply because the company shares of which they are the beneficial owners would decline in value if the mandate’s penalties for non-compliance were enforced, though that alone would satisfy Article III. See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 498 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990); Grubbs v. Bailes, 445 F.3d 1275, 1280 (10th Cir.2006). It is also because the mandate infringes the Greens’ religious liberties by requiring them to lend what their religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong. This sort of governmental pressure to compromise an article of religious faith is surely sufficient to convey Article III standing to the Greens, as it was for the plaintiffs in Thomas and Lee and in so many other religious liberty cases. Certainly our sister circuits have had no trouble finding Article III standing in similar cases where, say, individual pharmacists sought to contest regulations requiring their employers to dispense some of the same drugs or devices challenged here, see Stormans, Inc. v. Selecky, 586 F.3d 1109, 1121 (9th Cir.2009), or where individual soldiers sought to challenge military rules prohibiting their on-base day-care providers from including religious practices in their programs, see Hartmann v. Stone, 68 F.3d 973, 979 n. 4 (6th Cir.1995). Indeed, I do not understand the government or any of my colleagues to dispute the Greens’ Article III standing.[3]
But what of prudential standing doctrines, and perhaps most especially the shareholder standing rule? Prudential standing doctrines are not jurisdictional: they may be forfeited or waived. Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir.2007). In this case, the government did not raise prudential standing as a defense in the district court; the district court did not raise the issue for itself but proceeded to address the Greens’ claim on the merits; and the government did not mention any prudential standing concern in its principal brief to this court. To be sure, the government finally took up that cudgel when we asked for supplemental briefing on the issue. But even then it left critical questions unaddressed.
*1155 Take this one. Under the plain text of RFRA, standing is “governed by the general rules of standing under article III.” 42 U.S.C. § 2000bb-l(e) (emphasis added). Congress’s directive seems clear on its face — the text expressly tells us to apply the rules of standing under Article III and makes no mention of prudential (non-Article III) standing rules. In this way, the plain language seems to suggest prudential standing doctrine failed to make its way into RFRA. The government never confronts this possibility, let alone suggests the statute’s language is fairly susceptible to an alternative reading that might suffice to suggest an ambiguity about its meaning. In fact, the government’s supplemental brief on prudential standing doesn’t even cite RFRA’s text.
That’s not all. Judicially importing prudential standing doctrine into RFRA would appear not only to defy the statute’s plain text, it would also appear to run the risk of rendering the text surplusage. After all, Congress could hardly suspend Article III standing rules even if it wished to do so, and Congress had no need to speak if it wished to leave existing prudential rules in place. See Bennett v. Spear, 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (Congress “legislates against the background of ... prudential standing doctrine, which applies unless it is expressly negated”). So if Congress’s directive in § 2000bb-l(c) cannot curb the operation of constitutional standing rules, and if Congress’s directive is not needed to perpetuate prudential standing rules, what work is left for it to accomplish? The most obvious candidate is to rule out the use of prudential standing restrictions and, as we’ve seen, the text is certainly sufficient to that task. Again, however, the government fails to consider, let alone refute, this complication.
To be sure, at oral argument the government finally directed us to Jackson v. Dist. of Columbia, 254 F.3d 262 (D.C.Cir.2001), and suggested that case endorsed the use of prudential standing doctrine in RFRA cases. But it turns out that Jackson discussed only the interaction of exhaustion (not standing) doctrine and RFRA. See id. at 266-67. Moreover, when Jackson briefly mentioned standing in the course of addressing the plaintiffs’ exhaustion argument, it proceeded to consult the legislative history without first identifying an ambiguity in the text, as it was obliged to do. See Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (“We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.” (citations and internal quotation marks omitted)).
At the end of the day, then, and even after inviting supplemental briefing, we are left with almost no help from the government on the critical question of the statutory text’s receptivity to prudential standing doctrine. Without that assistance, without as well some meaningful adversarial engagement on the question, we run a serious risk of reaching “an improvident or ill-advised opinion,” not to mention causing unfairness to the individual plaintiffs who cannot now respond to the government’s eleventh-hour oral argument reference to Jackson. See Hill v. Kemp, 478 F.3d 1236, 1250-51 (10th Cir.2007) (citing Headrick v. Rockwell Int’l Corp., 24 F.3d 1272, 1277-78 (10th Cir.1994) (White, J.)). Applying our normal forfeiture rules in these circumstances is both more prudent and more just. We should bypass questions of prudential standing and reach the merits of the Greens’ claims, just as the district court did and both parties have.
*1156 That said, even if we were to entertain prudential standing questions at this late stage and assume the doctrine applies to RFRA despite the gaping questions the government left unaddressed, it’s far from clear the doctrine bars the Greens’ claim on its own terms. The government points us in the general direction of the shareholder standing rule, a feature of prudential standing doctrine barring corporate owners from asserting claims belonging to the corporation. See Alcan, 493 U.S. at 336, 110 S.Ct. 661. But that prudential rule does not bar corporate owners from bringing suit if they have “a direct, personal interest in a cause of action ... even if the corporation’s rights are also implicated.” Id. And in our case the Greens contend that they, as the controlling owners and operators of Hobby Lobby and Mardel, are the human beings who must direct the corporations to comply with the mandate and do so in defiance of their faith. They contend the ACA prevents them as individuals from owning and managing a corporation of the size of Hobby Lobby and Mardel — from practicing their traditional trade — without violating their religious beliefs. That much would seem to qualify as a quintessentially “direct” and “personal” interest protected even under the shareholder standing rule. See Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep’t of Agriculture, 123 F.3d 1098, 1102 (8th Cir.1997) (both employee grain inspectors and their corporate employer had standing to sue to enjoin law preventing employer from weighing grain because not only would the corporation be injured but the inspectors themselves would be “prevented from practicing their trade by virtue of the state’s actions ”) (emphasis added); Grubbs, 445 F.3d at 1280. On this score, we find ourselves in full agreement with Judge Matheson.[4]
Turning finally to the merits, they are by this point clear enough. Unlike Hobby Lobby and Mardel, there can be no color-able question that the Greens are “persons” entitled to RFRA’s protections. Neither can there be any colorable question that the Greens face a “substantial burden” on their “exercise of religion.” This statutory threshold is met when, among other things, the government presents a plaintiff with a “Hobson’s choice— an illusory choice where the only realistically possible course of action trenches on an adherent’s sincerely held religious belief.” Abdulhaseeb v. Calbone, 600 F.3d 1301, 1315 (10th Cir.2010). As we have already seen, the Greens face precisely that — a choice between abiding their religion or saving their business. With respect to the remaining statutory and equitable factors, Judge Tymkovieh shows why they all favor granting rather than withholding the requested relief, and none of that discussion warrants repetition here. Here it is enough to observe simply that the Greens, no less than Hobby Lobby and Mardel, merit the court’s protection while this case proceeds.
In many ways this case is the tale of two statutes. The ACA compels the Greens to act. RFRA says they need not. We are asked to decide which legislative direction controls. The tie-breaker is found not in our own opinions about good policy but in the laws Congress enacted. Congress structured RFRA to override other legal mandates, including its own statutes, if and when they encroach on religious liberty. *1157 When construing any “federal statutory law adopted after November 16, 1993,” Congress told us in no uncertain terms we should deem it “subject to [RFRA] unless such law explicitly excludes such application.” See 42 U.S.C. § 2000bb-3(b). In this way, RFRA is indeed something of a “super-statute.” Michael Paulsen, A RFRA Runs Through It: Religious Freedom and the U.S.Code, 56 Mont. L.Rev. 249, 253 (1995). And because the government identifies no explicit exclusion in the ACA to its dictates, it is RFRA’s legislative direction that must prevail in the end. Indeed, though our opinions today may be many and the routes we follow various, no fewer than six of us agree that the district court’s holding failed to give sufficient attention to RFRA’s powerful voice.
We could not, of course, reach the merits of the RFRA question if we thought the Anti-Injunction Act barred our way. The AIA precludes our consideration of suits seeking to “restrain the assessment or collection of any [federal] tax.” 26 U.S.C. § 7421(a). Though they agree on little else, both sides before us insist this lawsuit doesn’t meet that description. But a nontrivial argument could be made that they are all wrong: the plaintiffs, after all, seek to restrain the government’s use of any of the ACA’s enforcement mechanisms, including one that is expressly labeled a “tax.” See 26 U.S.C. § 4980D(a). And Congress’s decision to label something a tax usually is enough for it to trigger the AIA, “even where that label [is] inaccurate.” See NFIB v. Sebelius, — U.S. —, 132 S.Ct. 2566, 2583, 183 L.Ed.2d 450 (2012).
I write to emphasize that, even if the parties are wrong and the AIA does apply to this case, it still wouldn’t allow us to avoid reaching the merits. It wouldn’t because the government has expressly waived any reliance on the AIA: not only did it fail to raise the AIA as a defense in the district court, it discouraged us from applying the statute when we invited additional briefing on the matter. So long as the AIA affords the government only a waivable defense — so long as it doesn’t impose on the courts a jurisdictional limit on our statutory authority to entertain this case — we are bound to reach the merits. And a waivable defense, we are persuaded, is all the AIA provides.
The Supreme Court has cautioned that “[j]urisdiction ... is a word of many, too many, meanings.” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (internal quotation marks omitted). As a result, the Court has instructed us against relying on “drive-by jurisdictional rulings” that do not properly grapple with the distinctions between procedural requirements, claim elements, and bona fide jurisdictional limits on a court’s power. See Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 161, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010); Arbaugh v. Y & H Corp., 546 U.S. 500, 510-11, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); Steel Co., 523 U.S. at 91, 118 S.Ct. 1003. To rein in courts’ “profligate use of the term jurisdiction,” the Supreme Court has recently adopted “a readily administrable bright line for determining whether to classify a statutory limitation as jurisdictional.” Sebelius v. Auburn Reg’l Med. Ctr., — U.S. —, 133 S.Ct. 817, 824, 184 L.Ed.2d 627 (2013) (alterations omitted) (internal quotation marks omitted). That rule requires us to “inquire whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement ... courts should treat the restriction as nonjurisdictional in character.” Id.; see also Gonzalez v. Thaler, — U.S. —, 132 S.Ct. 641, 648-49, 181 L.Ed.2d 619 (2012); Arbaugh, 546 U.S. at 515-16, 126 S.Ct. 1235. Statutes that speak clearly to “the courts’ statutory or constitution *1158 al power to adjudicate the case” must of course be treated as jurisdictional and given their full effect. Steel Co., 523 U.S. at 89, 118 S.Ct. 1003 (emphasis in original). But statutes that speak to the rights or obligations of parties to a lawsuit establish “claim-processing rules,” are not and should not be treated as “jurisdictional prescriptions.” Reed Elsevier, 559 U.S. at 161, 130 S.Ct. 1237. In addition to the consulting statutory text, we may when necessary consider as well “context, including [the Supreme] Court’s interpretation of similar provisions in many years past.” Id. at 168,130 S.Ct. 1237.
When it comes to the AIA, all of these considerations point in the same direction.
First and most importantly, the AIA’s text dictates merely that “[ejxeept as provided in [other provisions inapplicable here] no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person.” 26 U.S.C. § 7421(a). Similar to other claims processing rules, the statute does not apply its prohibition to the court (let alone more specifically to the court’s power or jurisdiction) but applies its prohibition instead to a person. Indeed, the AIA’s language is nearly identical to the language of the copyright statute analyzed in Reed Elsevier — and we know with certainty that language “says nothing about whether a federal court has subject-matter jurisdiction.” 559 U.S. at 1664, 130 S.Ct. 1279. Compare 26 U.S.C. § 7421(a) (AIA: “no suit ... shall be maintained”), with 17 U.S.C. § 411(a) (copyright statute: “no civil action ... shall be instituted”).
Second, the AIA does not even appear in the same title of the Code as most statutes bearing on federal courts’ jurisdiction. See 28 U.S.C. § 1330 et seq. Instead, Congress chose to place the AIA in Title 26, in a chapter of the tax code discussing claims processing rules in proceedings brought by “Taxpayers and Third Parties.” On at least two occasions, the Supreme Court has found Congress’s decision to locate a statute “separate” from jurisdictional provisions suggestive contextual evidence that the statute in question was non-jurisdictional. See Reed Elsevier, 559 U.S. at 164-65, 130 S.Ct. 1237; Arbaugh, 546 U.S. at 514, 126 S.Ct. 1235. Precisely the same sort of suggestive contextual evidence exists here.
Third, in both of these respects (in both its language and placement) the AIA contrasts sharply with its cousin, the Tax Injunction Act (TIA), a provision controlling federal jurisdiction over suits seeking to enjoin state rather than federal tax collection. The TIA speaks directly to courts rather than to the parties. See 28 U.S.C. § 1341 {“The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law....” (emphasis added)). And the TIA is located within the same chapter of the same title of the U.S. Code as the other principal statutes governing federal jurisdiction. See id. Facts like these suggest Congress could have easily made the AIA jurisdictional if it wished and that it “would have spoken in clearer terms [in the AIA] if it intended” to do so. Gonzalez, 132 S.Ct. at 649. Neither is it insensible to think Congress might wish to protect state taxes even more than its own from federal lawsuits: comity and federalism concerns lurk there, while federal taxes and the lower federal courts are equally creations of Congress itself.
Finally, there is the Supreme Court’s treatment of the AIA in past cases. It is settled that the courts have “no authority to create equitable exceptions to jurisdictional requirements.” Bowles v. Russell, 551 U.S. 205, 214, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007). Yet the Supreme Court has repeatedly recognized equitable exceptions to the AIA’s application. See, *1159 e.g., Bob Jones Univ. v. Simon, 416 U.S. 725, 742-46, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); Enochs v. Williams Packing, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). In fact, the Supreme Court has expressly indicated that the predecessor to the AIA — containing substantially the same language — is non-jurisdictional, going so far as to allow the Solicitor General to proffer a “waiver of a defense” so the Court could reach the merits of the case before it. See Helvering v. Davis, 301 U.S. 619, 639, 57 S.Ct. 904, 81 L.Ed. 1307 (1937) (discussing Rev. Stat. § 3224). All of these results would seem impossible if the AIA really were jurisdictional. Admittedly, both the Supreme Court and this court have on other occasions referred to the statute as jurisdictional. See, e.g., Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 5, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); Sterling Consulting Corp. v. United States, 245 F.3d 1161, 1167 (10th Cir.2001). But these cases employ the jurisdictional label with little or no analysis— amounting to exactly the sort of “drive-by jurisdictional rulings” the Court tells us to view with a jaundiced eye. And more recently the Supreme Court has approached the AIA much more gingerly, taking care to avoid the jurisdictional epithet. See NFIB v. Sebelius, — U.S. —, 132 S.Ct. 2566, 2582, 183 L.Ed.2d 450 (2012) (holding that the AIA didn’t apply in that case by its own terms).
In the end, the AIA shows none of the hallmarks of a jurisdictional restriction, and has many features that collectively indicate otherwise. The government can waive its application, and it has done so before us. Given that, we can be sure, perhaps doubly sure, that reaching the merits of this case is appropriate and indeed our duty.

. See Gov’t Br. at 9 n.6 (acknowledging that some of the drugs referenced in the ACA mandate can "inhibit[ ] implantation”); Plaintiffs' Complaint ¶ 95 (suggesting same and citing an FDA publication). The dissent takes issue with the government’s concession and asserts that the drugs referenced in the ACA mandate do not have the effect of preventing the implantation of a fertilized egg. See Briscoe Op. at 1164, 1176-77. But the dissent also acknowledges that the devices referenced in the mandate do have this effect. Id. at 1164. Given this, there is no dispute from any quarter that the ACA forces Hobby Lobby and Mardel to underwrite something (be it drug or device) that offends the Greens’ religious beliefs, and of course the only relief the corporations or Greens seek is relief sufficient to protect those beliefs. See Tymkovieh Op. at 1123 n. 3.

. The primary authority the dissent relies on for its reading of the Greens’ religious objection turns out to be another circuit dissent that itself fails to account for Thomas or Lee. See Grote v. Sebelius, 708 F.3d 850, 856-57 (7th Cir.2013) (Rovner, J., dissenting). The only other authority the dissent relies on has nothing to do with RFRA, let alone the degree to which we must defer to a sincerely held religious belief about complicity. It concerns instead the degree of assistance the government (not a religious person) may afford religious activities before running afoul of the Constitution’s Establishment Clause (not an article of religious faith). See Briscoe Op. at 1178 (citing Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002)).

. The dissent emphasizes the fact that the Greens are the beneficial owners of Hobby Lobby and Mardel through trusts rather than the corporation’s direct owners, see Briscoe Op. at 1177, but I do not take this discussion as going so far as to suggest the Greens lack Article III standing. See generally Gollust v. Mendell, 501 U.S. 115, 125-27, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991) (indirect ownership of one corporation through another found sufficient for standing under federal securities laws); Fed.R.Civ.P. 17(a)(1)(E) (allowing a trustee to sue in her own name on behalf of a trust).

. Whether other individuals with lesser claims to involvement in a company or effecting a governmental mandate could lay claim to such a direct and personal interest is, no doubt, an important question, but it is one for a different case with different facts, not the one we confront today. Ours simply is not the case of ''managers” seeking standing, see Briscoe Op. at 1178, it is one involving individuals who are the beneficial owners, as well as the directors and officers, of privately held companies.